## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

|  |  |
|---|---|
| Marilyn Oakie, as Personal Representative for the Estate of Jacob Oakie, Deceased, on behalf of the Estate and Survivors, <br><br>     Plaintiff, <br><br> v. <br><br> Billy Woods, Sheriff of Marion County, Florida, in his official capacity; Heart of Florida Health Center, Inc.; Major Clint Bowen; Deputy Chief Robert Douglas; Captain Brian Spivey; Captain Alesia Chisholm; Monica Hopkins; Dr. John Pearson; Dr. Jose Rodriguez; Nurse John Little; Nurse Colleen Rutland; Nurse Sandy Gomez; Nurse Dorisvel Ramos; ARNP Duane Cunningham; Nurse Leslie Tyson; Nurse Andrea Younes; Officer N. Custodio; Deputy Gordon; Deputy Iovino; <br><br>     Defendants. | Case No: |

## COMPLAINT AND DEMAND FOR JURY TRIAL

For her Complaint, Plaintiff Marilyn Oakie as Personal Representative for the Estate of Jacob Oakie, decedent, by and through her attorneys, states and alleges as follows:

1

## INTRODUCTION

1. On July 28, 2024, Jacob Oakie died of streptococcal (pneumococcal) meningitis at AdventHealth Ocala Hospital after being transferred from the Marion County Jail, where he had been a pretrial detainee for approximately five weeks.

2. Jacob Oakie had been complaining of severe ear pain, drainage from his left ear, swelling, high fever, dizziness, nausea, and vomiting for more than one week before he was finally transported to the hospital on July 26, 2024.

3. The cause of his death—pneumococcal meningitis arising from left otomastoiditis—was preceded by days of documented and escalating symptoms that staff at the Marion County Jail and its contractor, Heart of Florida Health Center, Inc., observed but failed to address.

4. Despite Jacob Oakie's persistent complaints and objective signs of serious infection, including fever exceeding 100 degrees, a dangerously low BMI, hearing loss, swollen jaw, profuse sweating, vomiting, and an elevated white blood cell count of 22.3, Defendants repeatedly dismissed and ignored his condition.

5. On the morning of July 26, 2024, as Jacob lay in the jail infirmary in an altered mental state caused by advancing meningitis—a recognized symptom of the disease—Officer N. Custodio pepper-sprayed him and

Deputies Gordon and Iovino placed him in hand restraints. Only hours later was he transported to the hospital, where he died two days later.

6. The Marion County Sheriff's Office and Heart of Florida Health Center, Inc. maintain official policies and widespread practices that deprive detainees access to medical care. These customs proximately caused Jacob Oakie's death.

7. At the time of his death, Jacob Oakie was a pretrial detainee.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§ 1331, 1343.

9. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of civil rights under the Fourteenth Amendment to the U.S. Constitution.

10. Plaintiff further invokes the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367, to consider the state law claims alleged herein.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the Middle District of Florida. Moreover, upon information and belief, all parties reside in or conduct business in this District.

12. All conditions precedent to this lawsuit have occurred, been performed, or been waived. Specifically, Plaintiff has complied with all applicable pre-suit notice provisions of section 768.28, Florida Statutes, for her claims under the Florida Wrongful Death Act (FWDA).

## PARTIES

13. Plaintiff Marilyn Oakie is the duly appointed Personal Representative of the Estate of Jacob Oakie, having been so appointed by the probate division of the Circuit Court for Marion County, Florida. Plaintiff Marilyn Oakie brings this lawsuit as Personal Representative on behalf of the Estate of Jacob Oakie as well as herself as Jacob Oakie's survivor.

14. At all times relevant, Plaintiff Marilyn Oakie is and was a resident of Arizona.

15. At all times relevant, Jacob Oakie was a pretrial detainee confined in the Marion County Jail (MCJ), a jail managed and operated by the Marion County Sheriff's Office (MCSO) in Marion County, Florida.

16. At all times relevant, Defendant Sheriff Billy Woods was and is the elected Sheriff of Marion County, Florida. As the constitutional officer elected in accordance with Chapter 30, Florida Statutes, and Article VIII, section 1, of the Florida Constitution, Defendant Woods is tasked with implementing, ratifying, and approving the policies and practices

4

of the MCSO. Defendant Billy Woods was at all times material the final policymakers for MCSO with respect to the MCJ.

17.    Sheriff Woods is sued in his official and individual capacities and is subject to suit for negligence and wrongful death pursuant to section 768.28, Florida Statutes, as well as Plaintiff's constitutional claims.

18.    Director Monica Hopkins was at all relevant times an employee and agent of MCSO. They are sued in their individual capacity.

19.    Major Clint Bowen was at all relevant times an employee and agent of MCSO. They are sued in their individual capacity.

20.    Deputy Chief Robert Douglas was at all relevant times an employee and agent of MCSO. They are sued in their individual capacity.

21.    Captain Brian Spivey was at all relevant times an employee and agent of MCSO. They are sued in their individual capacity.

22.    Captain Alesia Chisholm was at all relevant times an employee and agent of MCSO. They are sued in their individual capacity.

23.    Dr. John Pearson was at all times the Chief Healthcare Administrator for Inmate Health at the Marion County Jail. He is an employee or agent of MCSO and/or Heart of Florida Health Center, Inc. He is sued in his individual capacity.

24.    Defendant Heart of Florida Health Center, Inc. is, upon information and belief, a not-for-profit corporation organized under Florida law that

contracted with MCSO to provide medical and healthcare services to inmates at the MCJ at all times relevant to this action. Heart of Florida Health Center acted under color of state law and is subject to suit under 42 U.S.C. § 1983. Heart of Florida Health Center is sued for its own unconstitutional customs and practices and for its employees' conduct in relation to the wrongful death of Jacob Oakie.

25.    Dr. Jose Rodriguez is an employee of Heart of Florida and an agent of Heart of Florida and the Marion County Sheriff's Office. He was at all times relevant the Medical Director for the Marion County Jail. At all times relevant, he acted under color of law and is sued in her individual capacity.

26.    At all times relevant, Nurse Colleen Rutland was employed by Heart of Florida Health Center and/or MCSO and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. Nurse Rutland is sued in her individual capacity.

27.    At all times relevant, Nurse Sandy Gomez was employed by Heart of Florida Health Center and/or MCSO and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. Nurse Gomez is sued in her individual capacity.

28. At all times relevant, Nurse Dorisvel Ramos was employed by Heart of Florida Health Center and/or MCSO to provide medical services to inmates at MCJ. Nurse Ramos is sued in her individual capacity.

29. At all times relevant, ARNP Duane Cunningham was employed by Heart of Florida Health Center and/or MCSO as an advanced registered nurse practitioner and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. ARNP Cunningham is sued in his individual capacity.

30. At all times relevant, Nurse Leslie Tyson was employed by Heart of Florida Health Center and/or MCSO and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. Nurse Tyson is sued in her individual capacity.

31. At all times relevant, Nurse Andrea Younes was employed by Heart of Florida Health Center and/or MCSO and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. Nurse Younes is sued in her individual capacity.

32. At all times relevant, Nurse John Little was employed by Heart of Florida Health Center and/or MCSO and was responsible for the safety and security of detainees in MCSO custody, including Jacob Oakie. Nurse Little is sued in his individual capacity.

7

33. At all times relevant, Officer N. Custodio was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Officer Custodio is sued in his individual capacity.

34. At all times relevant, Deputy Gordon was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Deputy Gordon is sued in his individual capacity.

35. At all times relevant, Deputy Iovino was employed by MCSO to provide security and correctional services to MCJ, including the protection, supervision, custody, care, and control of detainees. Deputy Iovino is sued in his individual capacity.

36. At all times material and relevant, all Defendants were acting under color of law and within the scope of their employment.

## FACTS

**A.   Jacob Oakie's Background and Booking into MCJ**

37. On June 20, 2024, Jacob Oakie was booked into the Marion County Jail on a probation violation charge—possession of methamphetamine.

38. At the time of booking on June 20, 2024, Jacob Oakie was 5'10" tall, weighed 112 pounds, and had a Body Mass Index (BMI) of 16.1, indicating that he was severely underweight.

39. At intake, Jacob Oakie was seen by Heart of Florida Health Center staff, who noted his recent medical history included an emergency department visit and recent left hand pain from a fall. He was placed on a mental health watch list and placed in general population in Gulf Pod Delta Section.

40. On June 27, 2024, Mr. Oakie submitted an Inmate Medical Request Form, in which he stated, "I'm hypoglycemic and I'm losing weight."

41. Despite his medical request, Mr. Oakie was not seen by medical staff until July 4, 2024.

### 1.    July 4, 2024

42. On July 4, 2024, Mr. Oakie's BMI decreased to 15.5 and his weight decreased to 108.4 pounds.

43. Weekly weight checks were ordered to occur for Mr. Oakie over the next 30 days.

44. A tuberculin skin test was ordered to occur in the next 48-72 hours.

### 2.    July 5, 2024

45. On July 5, 2024, Mr. Oakie was placed on a 3,000-calorie diet in response to his June 27 medical request.

46. Mr. Oakie was not seen by medical staff again until July 19, 2024.

### 3. July 19, 2024 – Nurse Rutland disregards Mr. Oakie's symptoms

47. On July 18, 2024, Jacob Oakie submitted another Inmate Medical Request Form that stated "Really bad ear infection it hurting really bad. I need medicen now it's hurting horribly" (sic).

48. The request was signed with no clinical notes on July 19, 2024.

49. On July 19, 2024, Jacob Oakie was evaluated by Nurse Colleen Rutland, to whom Mr. Oakie reported the following:

   a. His left ear was swollen, painful, and intermittently draining;

   b. His left jaw was swollen and painful;

   c. He had a "cold" and was experiencing nasal congestion, cough, and body aches;

   d. 8 out of 10 pain level.

50. His BMI had dropped further to 14.9 and his weight to 104 pounds.

51. Nurse Rutland believed his ears to appear clean and free of drainage with no notable swelling.

52. Nurse Rutland prescribed ibuprofen and mucus relief and told Mr. Oakie to return in three days if his condition worsened

### 4. July 20, 2024 – Mr. Oakie is sent to infirmary

53. The next day, on July 20, 2024, Jacob Oakie informed Nurse Rutland that his left ear pain had increased.

10

54. Nurse Rutland contacted Nurse Tyson, the charge nurse, and referred Mr. Oakie to the infirmary.

55. Nurse Mbayo Umba RN documented: "referral clinic for earache continue with pain med. No drainage from ears."

### 5.  July 21, 2024 – Mr. Oakie is not assessed or treated.

56. July 21, 2024, was the last day Jacob Oakie's mother, Marilyn, was able to speak with him by phone. He told her that his ear was hurting and that the jail was not giving him any medications.

57. No medical or nursing staff assessed or treated Mr. Oakie that day.

### 6.  July 22, 2024 – Mr. Oakie's symptoms worsen; he is diagnosed with the "common cold."

58. On July 22, 2024, at 11:04 a.m., Jacob Oakie was seen at sick call by Nurse Sandy Gomez. He complained of being unable to hear out of his left ear, with head pressure and a cough lasting two weeks.

59. Mr. Oakie weighed 103 pounds and his BMI had fallen to 14.8.

60. Mr. Oakie had a fever of 99.1°F.

61. Nurse Gomez diagnosed Mr. Oakie with a "common cold," gave Mr. Oakie Tylenol, cetirizine, continued NSAIDs, and cough medication, and educated him to increase water intake.

62. On July 22, 2024, at 4:10 p.m., Jacob Oakie was seen in a nursing evaluation by Nurse Dorisvel Ramos, RN.

63. Mr. Oakie reported dizziness, nausea, vomiting, chills, cough, and earache. He also reported sharp pain in his head and left ear, and a pain rating of 8 out of 10.

64. Nurse Ramos observed Mr. Oakie sweating profusely.

65. Mr. Oakie was transported to the infirmary again with a note, "Nurse Observation 23 hours."

66. On July 22, 2024, at 7:28 p.m., Nurse J. Little documented that Jacob had a fever of 99.7°F, a pulse of 112 beats per minute, dull body aches, and a pain rating of 6 out of 10.

67. Nurse Little, Nurse Ramos, and Nurse Gomez were aware that Mr. Oakie had been exhibiting symptoms of a serious medical need since July 18, but they did not do any of the following:

   a. Notify the charge nurse, a nurse practitioner, or physician of Mr. Oakie's worsening condition;

   b. Develop a treatment plan for Mr. Oakie;

   c. Facilitate Mr. Oakie's transfer to a hospital or other emergency medicine provider.

   **7.    *July 23, 2024—Mr. Oakie receives lab testing but no other treatment for his worsening symptoms.***

68. On July 23, 2024, at 4:30 a.m., Mr. Oakie refused his breakfast tray.

69. On July 23, 2024, at 8:15 a.m., Nurse Lucille Fraser documented that Mr. Oakie had a fever of 101.8°F, had vomited, and had been assessed by ARNP Duane Cunningham during morning rounds.

70. Cunningham ordered stat labs, including complete metabolic panel (CMP), complete blood count (CBC) with differential, and blood cultures.

71. This was the first time that labs were ordered for Mr. Oakie.

72. On July 23, 2024, at 9:28 a.m., ARNP Duane Cunningham documented an infirmary admission note: Jacob had fever, cough, congestion, progressively worsening cold symptoms, left ear pain, weakness, and nausea and vomiting starting overnight with fever.

73. ARNP Cunningham ordered IV fluids, chest X-ray, Benadryl, Zofran, Ibuprofen, mucus relief, and cetirizine. An isolation order was noted.

74. The chest X-ray showed no acute findings, and there were no other diagnostic tests ordered.

75. The lab results were reported to providers at the jail on July 23, 2024, but were not reviewed until the next day.

### 8. *July 24, 2024—Mr. Oakie's lab results reflect a serious, systemic infection, for which he receives no treatment.*

76. On July 24, 2024, at 9:01 a.m., Nurse Leslie Tyson noted a fever of 102.1°F.

77. Nurse Tyson noted that Mr. Oakie had a wet, non-productive cough and was dry heaving.

78. Nurse Tyson added a hepatitis panel and noted that labs were pending.

79. Nurse Tyson prescribed allergy and nausea medication, Phenergan.

80. At 9:14 a.m., ARNP Cunningham reviewed the lab results, which reflected the following reflected the following critical values consistent with a severe, systemic infection well beyond that of a common cold:

   a. white blood cell count (WBC) of 22.3, severely elevated (a normal WBC is 4.5 to 11.0);

   b. neutrophils of 20.3, critically elevated; glucose of 180, high;

   c. AST of 38, elevated, indicating liver stress;

   d. ALT of 80, elevated, indicating liver inflammation;

   e. low hemoglobin;

   f. elevated monocytes; and

   g. elevated immature granulocytes.

81. Cunningham noted Mr. Oakie's vomit to be dark.

82. Cunningham noted Mr. Oakie's generalized abdominal discomfort.

83. Cunningham noted that Mr. Oakie was suffering from "continued fever, nausea, vomiting."

84. Cunningham documented that Mr. Oakie was noncompliant with the NPO (nothing by mouth) status that had been ordered, noting that Mr. Oakie was drinking more than just sips of water.

14

85. Despite these critical lab values and symptoms, which reflected severe systemic infection, Nurse Tyson and ARNP Cunningham failed to take any reasonable steps to address Mr. Oakie's serious medical needs, such as:

   a. Notifying a physician of Mr. Oakie's deteriorating condition;

   b. Developing a treatment plan;

   c. Facilitating Mr. Oakie's transfer to a hospital or obtain emergency outside consultation.

86. At 8:18 p.m., Mr. Oakie was seen by Nurse Andrea Younes, who noted that Mr. Oakie had decreased hearing in his left ear and dizziness with ambulation.

### 9.   July 25, 2024 – Mr. Oakie's symptoms continue to worsen without treatment.

87. On July 25, 2024, at 7:30 a.m., Nurse Leslie Tyson documented a fever of 102.9°F. A temperature recheck at 8:45 a.m. showed 100.4°F.

88. At 7:00 p.m., Nurse Younes documented abdominal tenderness, non-productive cough, negative blood cultures, and a fever of 101.2°F. She also observed Mr. Oakie spitting into the toilet.

89. Despite assessing Mr. Oakie's continued and worsening symptoms, including a *fourth day* of a significant fever, Nurse Tyson and Nurse

Younes failed to take any reasonable steps to address Mr. Oakie's serious medical needs, such as:

a. Notifying a nurse practitioner or physician of Mr. Oakie's deteriorating condition;

b. Developing a treatment plan;

c. Facilitating Mr. Oakie's transfer to a hospital or obtain emergency outside consultation.

90. At no point between July 19 and July 25, 2024, did any Defendant medical staff member document or investigate the escalating constellation of symptoms—severe ear pain, jaw swelling, high fever, hearing loss, elevated WBC, vomiting, dizziness, and neurological changes—as consistent with otomastoiditis progressing to meningitis, or take steps to transfer Jacob Oakie to a hospital for emergency evaluation.

### 10.    *July 26, 2024 –Mr. Oakie is finally sent to the hospital after an officer pepper-sprays him.*

91. On July 26, 2024, in the early morning hours, Jacob Oakie was in the jail infirmary in an altered mental state and exhibiting the symptoms that medical staff had observed over the prior twelve days.

92. At approximately 1:58 a.m., Jacob Oakie refused his IV, stated he wanted to return to his pod, and began yelling and hitting the glass of the infirmary cell. He continued yelling for several hours.

93. At approximately 5:10 a.m. on July 26, 2024, Deputy N. Custodio ordered Mr. Oakie to stop kicking the cell door. Deputy Custodio ordered Jacob to turn around and submit to hand restraints.

94. It was obvious based on his behavior that Mr. Oakie was in a state of severe distress and mental alteration that prevented him from understanding and/or complying with orders.

95. Deputy Custodio sprayed Jacob Oakie with pepper gel.

96. Deputies Gordon and Iovino responded and placed Mr. Oakie in hand restraints.

97. Mr. Oakie was decontaminated in a shower.

98. Deputy Custodio, Deputy Gordon, and Deputy Iovino did not seek medical evaluation for Jacob Oakie before using force on him despite his documented history of escalating illness, his obvious altered mental state, and his presence in the infirmary.

99. At 7:41 a.m. on July 26, 2024, Nurse Ramos called 9-1-1.

100. At 8:02 a.m., Jacob Oakie was transported to AdventHealth Ocala Hospital per Dr. Rodrigues. He was awake but confused upon transport.

**B. Jacob Oakie's Death at AdventHealth Ocala Hospital**

101. Upon arrival at AdventHealth Ocala Hospital on July 26, 2024, Jacob Oakie was evaluated in the emergency department. He was noted to

17

have been vomiting two to three days prior, was unable to tolerate oral intake, and was becoming confused. He met sepsis criteria with an initial lactate of 2.6.

102. At AdventHealth, Jacob Oakie underwent a CT of the head, which revealed diffuse sulcal effacement of the supratentorial brain with mild hydrocephalus—findings consistent with meningitis.

103. An ENT consult noted left mastoid air cell opacification—fluid, pus, or tissue, in the air spaces in the ear's mastoid bone—consistent with otomastoiditis as the source of the infection.

104. While undergoing MRI at AdventHealth on July 26, 2024, Jacob Oakie went into respiratory distress and was immediately intubated.

105. CSF cultures confirmed Streptococcus pneumoniae. Blood cultures across multiple bottles were positive for Streptococcus pneumoniae. The clinical impression at AdventHealth included: (1) acute bacterial meningoencephalitis related to Streptococcus pneumoniae meningitis with purulent meningoencephalitis; (2) acute metabolic septic encephalopathy; (3) multiple small-volume brain subacute nonhemorrhagic infarcts secondary to purulent meningitis from left otomastoiditis; (4) vasodilatory-distributive shock from likely related sepsis; and (5) Austrian syndrome (meningitis, endocarditis, and pneumonia).

106. Treating physicians at AdventHealth noted that MRI of the brain revealed multiple scattered small-volume subacute nonhemorrhagic infarcts secondary to purulent meningitis from left otomastoiditis, and that MRI of the cervical spine revealed diffuse cervical cord leptomeningeal enhancement compatible with pyogenic meningitis.

107. On July 28, 2024, Jacob Oakie's family requested transition to comfort care only. A hospice order was placed.

108. Jacob Oakie died at 8:48 p.m. on July 28, 2024. He was 39 years old. The cause of death was respiratory failure with hypoxia caused by streptococcal meningitis.

109. The MCSO Homicide Division's own death investigation, conducted on July 29, 2024, concluded: "IT APPEARS THE DECEDENT BEGINS EXHIBITING SYMPTOMS ASSOCIATED WITH PNEUMOCOCCAL MENINGITIS IN THE DAYS LEADING UP TO JULY 26, 2024," and further noted that every documented symptom in Jacob Oakie's medical records—fever, chills, mental status changes, nausea and vomiting, agitation, rapid breathing—corresponds to recognized symptoms of pneumococcal meningitis.

110. Meningitis is a very treatable disease via prescription of antibiotics.

111. Had Mr. Oakie received the appropriate antibiotics, he would have had an increased chance of survival.

19

**C.    The Marion County Jail maintains unconstitutional policies and practices regarding inmate healthcare that make deaths like Mr. Oakie's inevitable.**

112.    Approximately four people die in MCJ per year, which is about four times the national average.

113.    Jail medical compliance reports indicate a significant noncompliance with jail medical standards.

114.    When an MCJ detainee requires medical treatment by an outside provider, such as a hospital, Marion County is responsible for paying medical expenses associated with that treatment.

115.    Accordingly, it is much cheaper for Defendant Woods to have detainees treated by the staff at MCJ, so Defendant Woods discourages MCJ staff from referring people to the hospital, even when medically necessary.

116.    At all times relevant, medical and correctional staff were routinely discouraged from transporting detainees to outside medical facilities to save the MCSO money.

117.    As a matter of official policy and widespread practice, MCJ staff fails to refer detainees suffering from a serious medical condition to a hospital or specialist even when they know that their condition requires treatment beyond the jail's capabilities.

118.    As a matter of official policy and widespread practice, MCJ staff are required to employ conservative treatment of serious medical needs to

20

avoid having to send someone to the hospital or receive a higher level of care, which is more likely to be expensive.

119. As a matter of official policy and widespread practice, Sheriff Woods understaffs the MCJ such that there are not enough medical providers to provide adequate and timely medical care to the detainees.

120. As a matter of official policy and widespread practice, detainee medical complaints at the MCJ are ignored and/trivialized, leading to deprivation of care, delays in care, and/or inmates receiving dangerously conservative treatment for serious medical needs.

121. Sheriff Billy Woods maintained a policy and widespread practice of delaying responses to medical requests by inmates, in which inmates could be made to wait an entire week to receive attention from medical staff.

122. Community members, former detainees, and former employees of MCSO have raised concerns—whether through the media, lawsuits, or internal complaints—about the inadequate health care in MCJ.

123. Sheriff Billy Woods is personally aware of the community's concerns that Marion County has a policy and practice of providing inadequate medical care to its detainees.

124. MCJ charges detainees for each medical request they make.

**D.    MCJ's poor medical care is largely driven by the MCSO's contract with Heart of Florida Health Center, who is contractually responsible for the medical care of MCJ inmates.**

125.    Sheriff Billy Woods, as the final policymaker for MCSO and MCJ, was responsible for ensuring constitutionally adequate policies, practices, and conditions of confinement, for all detainees.

126.    Sheriff Woods maintains a $14 million annual contract with Heart of Florida Health Center (HOF) to provide healthcare at MCJ.[1]

127.    HOF's contract with MCSO and other municipalities for jail healthcare caused its revenue to increase by nearly $20 million in two years.[2]

128.    Since contracting with HOF, MCJ has frequently suffered medical staffing shortages and failed to meet Florida jail model standards for timely handling of inmate complaints.

129.    Staffing gaps have often left only one registered nurse responsible for both infirmary monitoring and intake assessments at MCJ.

130.    Post-booking hospital visits in 2023 and 2024 dropped to less than half of historic levels. This is consistent with Woods' and HOF's policies and practice of depriving detainees of necessary transfers to the hospital in order to save money.

---

[1] https://www.ocalagazette.com/conflicting-information-on-14-million-heart-of-florida-contract/

[2] *Id.*

131. HOF as the contracted medical provider at MCJ, was responsible for ensuring constitutionally adequate medical care for all inmates in its custody, including timely diagnosis, treatment, and referral of serious medical conditions.

132. Sheriff Billy Woods is the final policymaker for the Marion County Sheriff's Office.

### 1. Defendants ignored serious and legitimate concerns about deficiencies in MCSO's official policies and practices relating to healthcare.

133. Sheriff Billy Woods, Major Clint Bowen, Deputy Chief Robert Douglas, Captain Brian Spivey, Captain Alesia Chisholm, Director Monica Hopkins, and Dr. John Pearson (collectively, "the Supervisory Defendants") were informed on many occasions that medical and correctional staff were depriving inmates of necessary healthcare pursuant to unconstitutional policies and practices.

134. Mary Coy was a Registered Nurse with approximately 35 years of experience at the time of her employment with MCSO.

135. At MCJ, Ms. Coy was a Medical Services liaison. Her responsibilities as such included:

   a. investigating, coordinating, and resolving inmate grievances that were of a medical nature;

   b. be alert for conditions or situations which inhibit efficient operation  of the corrections bureau or the medical function and **make recommendations and solutions.**

c.  Audit Heart of Florida's compliance with Florida's model jail standards, and make a public record report of such audits.

136.  On November 3, 2022, Captain Alesia Chisholm placed a Letter of Counseling in Ms. Coy's file. The letter of counseling advised Ms. Coy that she should "refrain from personal opinions related to inmate health diagnosis and treatments made by the Heart of Florida."

137.  In response to that letter, Ms. Coy wrote a written response on November 22, 2022, which was provided to MCJ supervisors Director Monica Hopkins, Major Clint Bowen, Deputy Chief Robert Douglas, Captain Brian Spivey, and Sheriff Woods by December 13, 2022.

138.  Ms. Coy's November 2022 letter placed Sheriff Woods and the other MCJ supervisors on notice of the following:

a.  The practices and procedures in place at MCJ and HOF as it related to detainee medical care had degraded significantly to the extent that inmates were being denied health care;

b.  Many inmates complained of pain due to their medication for nerve pain being discontinued without any substitution such as Tylenol or Ibuprofen;

c.  Many inmates with walking disabilities had their canes or other assistive devices confiscated by staff;

d.  At least one inmate with asthma and COPD was being denied breathing treatments and was denied access to medical care unless he entered significant respiratory distress;

e.  There was "lots of documentations of inmates suffering for hours before horrific things happen to them regarding their medical needs;"

24

139. Ms. Coy ended her November 2022 letter with the following:

> I am asking that the inmates (Human Beings) be given basic humane treatment as defined by policies/procedures, legal and ethical laws. Yes. I define this as a toxic environment, knowing what I know and fighting against it has put me in a bad position and I am tired of reading in documentation and hearing from inmates and staff of what is inhumane treatment. I am tired of crying about it and reporting it. I am asking that these inmates be heard and the concerned staff, so they can receive appropriate treatment as defined by laws and standards.

140. On or before December 13, 2022, Sheriff Billy Woods and Captain Brian Spivey were personally aware of the poor medical treatment in the jail, including the following:

   a. Sick call requests were often not being performed in a timely manner, with many not being completed at all;

   b. Heart of Florida Practitioners practiced "punitive medicine" and denied some of the most basic medical care to detainees at MCJ;

141. Ms. Coy also made Dr. John Pearson, Chief Healthcare Administrator for Inmate Health at the Marion County Jail, aware on multiple occasions of the repeated lapses in inmate care at MCJ.

142. Dr. Pearson wrote a letter to Captain Brian Spivey on December 5, 2022, explaining that he believed the relationship between Ms. Coy and MCJ was beyond repair. One of his criticisms of Ms. Coy was that she tended to question practitioners' treatment plans. He stated "doctors

provide treatment which is medically appropriate, but not necessarily what inmates want or desire."

143. Ms. Coy was instructed by her supervisors several times at MCJ that she should refrain from personal opinions related to inmate health diagnosis and treatment. The Supervisory Defendants were aware that she had been so instructed.

144. Before December 19, 2023, Ms. Coy had many conversations with Kristen Palmer about her concerns and frustration with the inmate care provided at MCJ.

145. On October 10, 2023, Ms. Coy had a meeting with Major Bowen, in which Ms. Coy relayed her concerns regarding inmate healthcare at MCJ.

146. Prior to December 14, 2023, Ms. Coy had a conversation with Major Bowen and Captain Chisholm that made them aware that many inmates were not being seen for sick call, even after multiple requests. Bowen and Chisholm disregarded this concern and accused Ms. Coy of not understanding the sick call process.

147. Prior to December 19, 2023, Ms. Coy had many conversations with MCJ supervisor Captain Chisholm about her concerns and frustration with the inmate care provided at MCJ.

26

148. On December 14, 2023, Ms. Coy submitted a report to MCJ supervisors Major Bowen and Captain Chisholm that reflected severe noncompliance with Florida Model Jail Standards 9.35 and 9.36, both of which concern the manner in which medications are dispensed to detainees.

149. During her employment and prior to Mr. Oakie's death, Ms. Coy raised an issue to her supervisors involving a detoxing inmate who endured hours of pain as nurses refused to treat him, ultimately leading to his death.

150. Rather than address the concerns raised by Ms. Coy, Defendant Woods fired her.

151. As a result of her repeated criticisms regarding the deficiencies in MCJ and HOF's medical care, Ms. Coy was terminated on August 27, 2024.

152. MCJ has not filled her position and no longer employs anyone whose responsibility it is to track MCSO or HOF's compliance with Florida's model jail standards.

153. Ms. Coy has filed a whistleblower lawsuit, alleging that Mr. Woods wrongfully terminated her because of her raising concerns about the medical care in the jail. Her allegations, all of which were raised to Sheriff Woods, Captain Chisholm, and Major Bowen during her employment and prior to Mr. Oakie's death, include the following:

27

    a.  Response time for responding to inmate medical requests expanding past seven days.

    b.  Disabled inmates were denied access to the grievance computer system through security, preventing them from filing medical complaints.

    c.  They jail failed to employ a dentist for four to six months, leading to a lack of crucial care and inmates developing abscesses in their mouths;

    d.  At least one inmate dying as a result of a nurse refusing to provide care.

154.  Sheriff Woods, Captain Chisholm, and Major Bowen were acutely aware of and deliberately indifferent to the policies and practices at the Marion County Jail previously described which ultimately caused Mr. Oakie's death.

### 2.  *Sheriff Woods continues to ignore and even mock the legitimate concerns about medical care within the jail.*

155.  Mr. Woods continues to ignore the continued problems of inadequate healthcare in MCJ and even mock those who dare publish criticisms about the policies and practices in his jail.

156.  In a video posted on MCSO's Facebook page, Mr. Woods stated:

> Hello Marion County citizens. Sheriff Woods here. I know many of you have heard negative things about

28

our jail in the tabloid news. So I want to take a moment to address that.

He went on to commend his staff for the medical attention they provided to someone who was arrested for child abuse, in which the subject was unconscious and given CPR by deputies, although apparently not sent to the hospital. He further stated,

> And understand this, we don't typically make a lot of arrests in health clubs. Many of those we arrest have bad habits, drugs, alcohol, etc. You've seen booking photos of 35-year-olds that look 85 because of a hard life of bad decisions. That's who ends up in our jail. And for a lot of them, that's the first time they've even seen a doctor. So, I just wanted to take a moment to commend my staff and the medical professionals who do a great job day in and day out. In fact, the inmate they treated last night completely recovered and was even able to attend his first court appearance this morning.

157. There are many people in the community who disagree and continue to raise concerns about medical care in the jail. The Facebook video received dozens of comments, including the following:

   a. "So what. U did your job. Hurray. But u let many people die. How do u explain the worst death rate in the country. Your medical staff is not professional and they never believe people. Then by the time they and u do something the person dies. Nice try."

   b. "I been in there and first hand watched a man have a medical emergency and watched your deputies yell at us for "banging on the glass" to get there attention for said emergency."

   c. "Congrats on not killing someone else I guess"

29

d. "One life being saved at intake doesn't count for the lives lost in the jail itself"

e. "You are so full of crap sheriff Woods I have been in your jail and I have seen how some of the medical staff and your detention deputies treat inmates for instance I was in your jail from October of 2023 to December of 2023 when I was released and there was a inmate in the pod I was in that was detoxing and was trying to get medical help because he was throwing up and couldn't keep food down and guess what he was told by the pod officer and these was the exact words " deal with it" it got to the point where myself and other inmates told him to complain of chest pain which he did and wouldn't you know he was kept in medical for 3 days because he was dehydrated so DO NOT SIT THERE AND SAY INMATES IN YOUR JAIL ARE TREATED PROPERLY YOU ARE A SINCERE DISGRACE TO THE BADGE because you cover up corruption in your department"

f. "that's one instance sheriff Billy Woods Marion County Sheriff's Office what about the other countless people that have died what about all the other botched investigations what about all the missing people from Marion county you ought to be ashamed of yourself getting up off of one instance and make it a video and trying to say everything on social media is all hyped up you should resign and disgrace you are a disgrace to law enforcement and to Marion county"

158. Mr. Woods told Marion County Board of Commissioners during a budget workshop that HOF provided good care for the inmates, "regardless of what these articles are being written out here, I don't give a crap what the media is saying. Heart of Florida does a damn good job of providing the services for the inmates." He continued, "They get a better medical service than you and I. I don't get a doctor 24/7— they get a doctor and medical 24/7 and all they got to do is ask for it."

30

159. Woods' claims about the sufficiency of medical care at MCJ are untrue. Inmates are routinely denied medical care because of the deliberate indifference by Woods, other MCSO supervisors, and Heart of Florida.

### Count 1: 42 U.S.C. § 1983, Fourteenth Amendment Deliberate Indifference to Serious Medical Need

*(against Defendants Rutland, Gomez, Ramos, Cunningham, Tyson, Younes, Little, Custodio, Gordon, and Iovino)*

160. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

161. Jacob Oakie, as a pretrial detainee at MCJ, had a constitutional right under the Fourteenth Amendment to receive adequate medical care for his serious medical needs.

162. At all times relevant, Defendants Rutland, Gomez, Ramos, Cunningham, Tyson, Younes, and Little knew that Jacob Oakie had a serious medical need.

163. At all times relevant, Defendants Rutland, Gomez, Ramos, Cunningham, Tyson, Younes, and Little knew that Jacob Oakie's symptoms indicated a medical condition more severe than a common cold.

164. At all times relevant, Defendants Rutland, Gomez, Ramos, Cunningham, Tyson, Younes, and Little knew that continuing to treat

Mr. Oakie as if he had the common cold posed a serious threat and risk of harm to his health and well-being.

165. The substantial risk of serious harm to Jacob Oakie was objectively obvious. His symptoms were documented in the medical record over the course of more than one week and reflected a severe, escalating, and life-threatening infection.

166. Defendants Rutland, Gomez, Ramos, Cunningham, Tyson, Younes, and Little consciously disregarded, recklessly disregarded, and/or were deliberately indifferent to Jacob Oakie's serious medical needs in the following ways:

   a. Failing to adequately examine and evaluate Jacob Oakie's left ear, jaw, and neck despite repeated complaints of severe pain, swelling, and drainage;

   b. Treating Mr. Oakie as if he had nothing more than a common cold, when they were aware of symptoms obviously reflecting a much more serious medical condition;

   c. Failing to perform diagnostic testing capable of identifying otomastoiditis or meningitis, or refer Mr. Oakie to a facility capable of conducting the appropriate diagnostic testing;

   d. Failing to refer Mr. Oakie to a hospital considering Mr. Oakie's symptoms reflecting a serious medical condition;

   e. Failing to consult a physician or specialist considering Mr. Oakie's symptoms reflecting a serious medical condition;

   f. Continuing to treat a serious medical need with ibuprofen, Tylenol, mucus relief, and antihistamines, which were ineffective;

g. Failing to investigate the escalating constellation of symptoms—severe ear pain, jaw swelling, high fever, hearing loss, elevated WBC, vomiting, dizziness, and neurological changes;

h. Ignoring Mr. Oakie's symptoms that were indicative of a serious medical need;

i. Failing to provide treatment for Mr. Oakie's serious medical condition;

167. Defendants Cunningham, Tyson, and Younes consciously disregarded, recklessly disregarded, and/or were deliberately indifferent to Jacob Oakie's serious medical needs in the following ways:

a. Ignoring lab results that were extremely abnormal and reflected a severe systemic infection requiring emergency hospitalization;

b. Continuing to treat Mr. Oakie as if he had nothing more than the common cold when his lab results reflected a severe, systemic infection.

168. Defendants Custodio, Gordon, and Iovino were deliberately indifferent to Jacob Oakie's serious medical needs in the following ways:

a. Using pepper spray and physical restraints on an infirmary patient exhibiting documented signs of altered mental status, agitation, and confusion without first seeking medical evaluation.

b. Failing to recognize that Jacob Oakie's agitation and non-compliance constituted medical symptoms requiring evaluation, not discipline.

c. Failing to seek immediate medical attention for Jacob Oakie after using chemical agents on a critically ill patient.

169. Defendants' deliberate indifference to Jacob Oakie's serious medical needs directly and proximately caused his death.

170. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands judgment against the individual Defendants for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### Count 2: 42 U.S.C. § 1983, Fourteenth Amendment Monell Liability

*(against Sheriff Billy Woods, in his official capacity)*

171. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

172. Jacob Oakie, as a pretrial detainee at MCJ, had a constitutional right to receive adequate medical care for serious medical needs.

173. Sheriff Woods maintained an official policy and widespread practice of deliberate indifference to the serious medical needs of inmates at MCJ, as described *supra*, including depriving inmates with serious and progressing medical conditions of timely and adequate care, depriving critically ill inmates of access to hospital care, and failing to properly staff its jail with medical providers.

174. Sheriff Woods' policies, practices, and customs of deliberate indifference to inmate medical needs directly and proximately caused Jacob Oakie's death.

175. Sheriff Billy Woods' failure to implement reasonable measures to abate the substantial risk of constitutionally inadequate medical care at MCJ directly and proximately caused Jacob Oakie's death.

176. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands judgment against Defendant Woods for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## Count 3: 42 U.S.C. § 1983, Fourteenth Amendment *Monell* Liability

*(against Heart of Florida Health Center, Inc.)*

177. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

178. HOF maintained a widespread custom and practice of providing inadequate medical care to MCJ inmates, including depriving inmates with serious and progressing medical conditions of timely and adequate

care, depriving critically ill inmates of access to hospital care, and failing to properly staff its jail with medical providers.

179. Heart of Florida Health Center, Inc. acted under color of state law by contracting with MCSO to provide medical services at MCJ and is subject to §1983 liability as a private entity performing a traditionally public function and other actions fairly attributable to the state.

180. Jacob Oakie had a clearly established constitutional right to receive adequate medical care for his serious medical needs as a pretrial detainee.

181. Heart of Florida Health Center's official policies and widespread customs were the moving force behind Jacob Oakie's death, in that they directly caused the failure to diagnose and treat his left otomastoiditis and progressing bacterial meningitis, resulting in irreversible neurological injury and death.

182. Plaintiff has been required to engage the services of the undersigned counsel. As such, Plaintiff is entitled to an award of reasonable attorney's fees and costs pursuant to 42 U.S.C. §§ 1983 and 1988.

WHEREFORE, Plaintiff demands judgment against Defendant Heart of Florida Health Center, Inc. for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

### Count 4: 42 U.S.C. § 1983, Fourteenth Amendment
### Supervisory Liability

*(against Sheriff Billy Woods in his individual capacity, Monica Hopkins, Major Clint Bowen, Deputy Chief Robert Douglas, Captain Brian Spivey, Captain Alesia Chisholm, and Dr. John Pearson)*

183. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

184. Billy Woods, Monica Hopkins, Major Clint Bowen, Deputy Chief Robert Douglas, Captain Brian Spivey, Captain Alesia Chisholm, and Dr. John Pearson (collectively, "the Supervisory Defendants") were aware of a history of widespread abuses of inmates at MCJ involving deprivation of medical care.

185. The Supervisory Defendants were aware that detainees at MCJ were being subject to the unconstitutional policies and practices which have been described *supra*.

186. The Supervisory Defendants continued to implement the policies and practices which were depriving MCJ detainees of medical care.

187. The Supervisory Defendants failed to correct deprivations of medical care caused by their subordinates consistent with the unconstitutional policies and practices.

188. Because the Supervisory Defendants failed to correct the deprivations of medical care that had become rampant at MCJ, the unconstitutional

policies and practices were able to persist, and Mr. Oakie was deprived medical care consistent with those policies and practices.

189. The Supervisory Defendants engaged in conduct that establishes the necessary causal connection between their actions and the Mr. Oakie's death.

WHEREFORE, Plaintiff demands judgment against Billy Woods, Monica Hopkins, Major Clint Bowen, Deputy Chief Robert Douglas, Captain Brian Spivey, Captain Alesia Chisholm, and Dr. John Pearson for damages, costs, disbursements, attorney's fees, interests, and for any further relief that this Court deems fair and just.

## Count 5: Wrongful Death—Negligence

*(against Sheriff Billy Woods, in his official capacity)*

190. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

191. Sheriff Billy Woods is responsible for the acts and omissions that caused Jacob Oakie's death.

192. Sheriff Billy Woods had a duty to maintain official policies and practices that kept people in his custody safe.

193. Sheriff Billy Woods had a duty to maintain official policies and practices that provided inmates with access to medical care.

38

194. Sheriff Billy woods had a duty to maintain official policies and practices that ensured detainees with serious medical needs received the appropriate medical treatment.

195. Sheriff Billy Woods had a duty to take reasonable measures to ensure that inmates in the custody of MCJ received constitutionally and legally adequate medical care, including through the implementation of policies and practices.

196. Sheriff Billy Woods had a duty to take reasonable measures to protect inmates from the substantial risk of harm posed by constitutionally inadequate medical care at MCJ.

197. Sheriff Woods maintained an official policy and widespread practice of deliberate indifference to the serious medical needs of inmates at MCJ, as described *supra*, including depriving inmates with serious and progressing medical conditions of timely and adequate care, depriving critically ill inmates of access to hospital care, and failing to properly staff its jail with medical providers.

198. Sheriff Woods' policies, practices, and customs of deliberate indifference to inmate medical needs constituted a breach of duty.

199. Sheriff Woods' policies, practices, and customs of deliberate indifference to inmate medical needs directly and proximately caused Jacob Oakie's death.

200. Sheriff Billy Woods failed to take reasonable measures to ensure adequate medical care at MCJ or to protect inmates from the substantial risk of harm posed by the constitutionally inadequate medical care provided at the facility.

201. Sheriff Billy Woods' failure to take reasonable measures directly and proximately caused Jacob Oakie's death.

202. Jacob Oakie's death was a foreseeable consequence of Sheriff Billy Woods' failure to take reasonable measures to ensure constitutionally adequate medical care at MCJ.

WHEREFORE, Plaintiff seeks to recover lost support and services, medical expenses, mental pain and suffering, and loss of earnings.

### Count 6: Wrongful Death

*(against Heart of Florida, Inc.)*

203. Plaintiff incorporates and re-alleges paragraphs 1 through 159 above as if fully set forth herein.

204. At all times relevant, Heart of Florida and employees and agents thereof owed duty to act reasonably towards Jacob Oakie.

205. Heart of Florida had a duty to maintain official policies and practices that provided MCJ detainees with access to medical care.

40

206. Sheriff Billy woods had a duty to maintain official policies and practices that ensured detainees with serious medical needs received the appropriate medical treatment.

207. Heart of Florida owed a duty to take reasonable measures to ensure that inmates in the custody of MCJ received constitutionally and legally adequate medical care, including through the implementation of policies and practices.

208. Heart of Florida maintained an official policy and widespread practice of deliberate indifference to the serious medical needs of inmates at MCJ, as described *supra*, including depriving inmates with serious and progressing medical conditions of timely and adequate care, depriving critically ill inmates of access to hospital care, and failing to properly staff its jail with medical providers.

209. Heart of Florida's policies, practices, and customs of deliberate indifference to inmate medical needs constituted a breach of duty.

210. Heart of Florida's policies, practices, and customs of deliberate indifference to inmate medical needs directly and proximately caused Jacob Oakie's death.

211. At all times relevant, Heart of Florida and employees and agents thereof breached their duties.

41

212. Defendants' breaches directly and proximately caused Jacob Oakie's death. Jacob Oakie's death was a foreseeable consequence of Defendants' failures.

213. WHEREFORE, Plaintiff seeks to recover lost support and services, medical expenses, mental pain and suffering, and loss of earnings.

## Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Marilyn Oakie hereby demands a jury trial of all issues capable of being determined by a jury.

## Prayer for Relief

WHEREFORE, Plaintiff Marilyn Oakie, as Personal Representative for the Estate of Jacob Oakie, and on behalf of the Estate and herself as Mr. Oakie's survivor, prays for judgment against Defendants, damages, attorneys' fees, disbursements, costs, and any other and further relief as this Court deems just and equitable.

Dated: June 3, 2026

/s/ James M. Slater
James M. Slater (FBN 111779)
Slater Legal PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
james@slater.legal
Tel. (404) 458-7283

ROMANUCCI & BLANDIN
Sam Harton*
321 N. Clark St.
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
Email: sharton@rblaw.net

*Attorneys for Plaintiff*

**Pro hac vice* forthcoming