UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARILYN OAKIE, AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF JACOB OAKIE, DECEASED, ON BEHALF OF THE ESTATE AND SURVIVORS,

PLAINTIFF,

CASE NO. 5:26-cv-00405-WFJ-PRL

v.

BILLY WOODS, SHERIFF OF MARION COUNTY, FLORIDA, IN HIS OFFICIAL CAPACITY, ET AL,

DEFENDANTS,
_______________________________________/

**MOTION TO DISMISS AMENDED COMPLAINT [DOC. 25] BY DEFENDANTS SHERIFF WOODS, SPIVEY, CUSTODIO, GORDON, AND IOVINO**

Defendant Billy Woods, Sheriff of Marion County, Florida, in his official capacity ("Sheriff Woods"), Captain Brian Spivey ("Spivey"), Officer N. Custodio ("Custodio"), Deputy Gordon ("Gordon"), and Deputy Iovino ("Iovino") (each, a "Defendant" and together, the "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b), hereby move to dismiss the Amended Complaint [Doc. 25], and incorporate their memorandum in support.

1. On June 3, 2026, Plaintiff filed her Complaint in this Court, [Doc. 1], which she thereafter amended on July 29, 2026. [Doc. 25].

2. This matter arises from alleged events during Mr. Jacob Oakie's tenure as a Marion County Jail (MCJ) inmate from June 20, 2024, through July 26, 2024. While in MCJ, Oakie exhibited symptoms prompting his evaluation and treatment by Heart of Florida (HOF) medical providers, including in the MCJ Infirmary. In the Infirmary, Oakie eventually became loud and disruptive, and then resisted commands by MCJ deputy Custodio that resulted in her application of pepper spray. He was thereafter handcuffed and taken to a decontamination shower, then medically evaluated. He thereafter continued to receive treatment for a brief time until his condition was such that he was transferred to a local hospital where he expired two days later. The cause of his death was determined to be bacterial meningitis.

3. Plaintiff's Amended Complaint brings the following claims against the Defendants moving for dismissal herein:

| **Count** | **Defendant(s)** | **[Doc. 25] ¶¶** | **Claim** |
|---|---|---|---|
| 1 | Custodio<br>Gordon<br>Iovino | 160-170 | § 1983 deliberate indifference to serious medical needs |
| 2 | Woods | 171-176 | § 1983 policy, custom, or practice of deliberate indifference to serious medical needs |
| 4 | Woods<br>Spivey | 183-189 | § 1983 supervisory liability as to deliberate indifference to serious medical needs |
| 5 | Woods | 190-202 | Wrongful Death - Negligence |

4. Plaintiff fails to state a claim against any moving Defendant upon which relief can be granted.

5. As a threshold matter, Plaintiff fails to establish any deliberate indifference to a serious medical need by anyone. Consequently, all of her § 1983 claims fail. Plaintiff also fails to establish the requisite actions and causal connections necessary for supervisory liability or Monell liability, so those § 1983 claims also fail for that reason.[1]

6. As for Plaintiff's wrongful death – negligence claim, Plaintiff alleges what amounts to be a medical malpractice claim for the treatment Oakie received from Sheriff Woods' contracted-for inmate health care provider, HOF, and is, in part, premised on what she alleges to be the discretionary policies of Sheriff Woods. The entire claim is barred for Plaintiff's failure to satisfy Florida's conditions precedent to such a claim, and the portion directed to discretionary policies is also barred by sovereign immunity.

Wherefore Defendants respectfully request the Court enter an order dismissing Plaintiff's claims against them.

[1] Plaintiff's Amended Complaint identifies Count 4 as a claim against Sheriff Woods in his individual capacity. This claim cannot be maintained as that entity is not a party-Defendant, nor was that individual entity served with process and thus this Court is without personal jurisdiction over him, and therefore that claim should be dismissed. All arguments herein against liability as to Billy Woods in his individual capacity are offered in the alternative (in the event this Court determines he is a party-Defendant and subject to the jurisdiction of this Court), and in no way concede that he is a party-Defendant properly brought within the jurisdiction of this Court.

MEMORANDUM

## I. PLEADING REQUIREMENTS AND REVIEW

Fed. R. Civ. P. 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007). The purpose of this standard is to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." Conley v. Gibson, 355 U.S. 41, 47 (1957). In bringing a complaint, a plaintiff is required to provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do [. . . .]" Twombly, 550 U.S. at 555. A plaintiff must actually allege "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

A complaint that fails to contain sufficient factual matter to state a claim for relief may be subject to a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Dismissal of a complaint is appropriate "where the well pleaded facts do not permit the court to infer more than the mere possibility of misconduct." See Iqbal, 556 U.S. at 679. Conclusory allegations, unwarranted factual deductions, or legal conclusions

masquerading as facts will not prevent dismissal. Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003).

While a court must accept the well-pled facts in a complaint as true when reviewing a 12(b)(6) motion to dismiss, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Twombly, 550 U.S. at 555. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. at 557. In considering a motion brought pursuant to Fed. R. Civ. P. 12(b)(6), a Court is largely limited to the four corners of a complaint. See Christopher v. Harbury, 536 U.S. 403 (2002); Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003). Under the Incorporation-by-Reference Doctrine, however, evidence attached to a motion to dismiss may be considered without converting the motion into a motion for summary judgment if the evidence is (1) central to the plaintiff's claim; and (2) the evidence's authenticity is not challenged. Swinford v. Santos, 121 F.4th 179, 187 (11th Cir. 2024). This is because courts need not rely on "visible fiction." Scott v. Harris, 550 U.S. 372, 381 (2007). In a similar vein, a court need not accept facts alleged in a complaint that are internally inconsistent, run counter to facts of which the court can take judicial notice, are conclusory allegations, are unwarranted deductions, or are legal conclusions. See, e.g., Ellen S. v. Fla. Bd. of Bar Examiners, 859 F. Supp. 1489, 1492 (S.D. Fla. 1994).

## II. PLAINTIFF'S AMENDED COMPLAINT NECESSARILY INCORPORATES BY REFERENCE JACOB OAKIE'S INMATE MEDICAL FILE

The lengthy allegations in Plaintiff's Amended Complaint make extensive use of Jacob Oakie's MCJ Inmate Medical File in recounting his time and treatment at the MCJ and thereafter. Relevant to Oakie's treatment at the MCJ itself, Plaintiff presents approximately 62 allegation-paragraphs that draw directly from the file, <u>see</u> [Doc. 25, ¶¶ 33-95; Doc.31-1], including vital signs and health information,[2] direct quotes, and explicit reference to notes made and things documented throughout.[3] In doing so, Plaintiff makes the

---

[2] All medical file page references in this motion are to stamped Bates numbers. <u>Compare</u> [Doc. 25, ¶ 33 (various vital signs)] <u>with</u> [Doc. 31-1, pp. 37-40 (same)]; <u>Compare</u> [Doc. 25, ¶ 37 (BMI and weight)] <u>with</u> [Doc. 31-1, p. 46 (same)]; <u>compare</u> [Doc. 25, ¶ 45 (BMI and weight)] <u>with</u> [Doc. 31-1, pp. 51-52 (same)]; <u>compare</u> [Doc. 25, ¶ 54-55 (BMI, weight, temperature)] <u>with</u> [Doc. 31-1, pp. 56-57 (same)]; <u>compare</u> [Doc. 25, ¶ 61 (temperature and pain rating)] <u>with</u> [Doc. 31-1, pp. 60-61 (same)]; <u>compare</u> [Doc. 25, ¶ 64 (temperature)] <u>with</u> [Doc. 31-1, pp. 63 (same)]; <u>compare</u> [Doc. 25, ¶ 71 (temperature)] <u>with</u> [Doc. 31-1, pp. 68-69 (same)]; <u>compare</u> [Doc. 25, ¶ 82 (temperatures)] <u>with</u> [Doc. 31-1, pp. 78-79 (same)].

[3] All emphasis added: <u>Compare</u> [Doc. 25, ¶ 34 ("At intake, Jacob Oakie was seen by Heart of Florida Health Center staff, who **noted** his recent medical history . . .")] <u>with</u> [Doc. 31-1, p. 39 (reflecting, among other things, the exact notes in Plaintiff's allegation). <u>Compare</u> [Doc. 25, ¶ 50 ("Nurse Mbayo Umba RN **documented**: . . .")] <u>with</u> [Doc. 31-1, p. 54 (reflecting, among other things, the exact notes in Plaintiff's allegation); <u>Compare</u> [Doc. 25, ¶ 56 ("Nurse Gomez diagnosed Mr. Oakie with a **'common cold**' . . .")] <u>with</u> [Doc. 31-1, p. 57 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 60 ("Mr. Oakie was transported to the infirmary again **with a note, 'Nurse Observation 23 hours.'** ")] <u>with</u> [Doc. 31-1, pp. 58-59 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 61 ("On July 22, 2024, at 7:28 p.m., Nurse J. Little **documented**. . . ")] <u>with</u> [Doc. 31-1, pp. 60-61 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 64 ("On July 23, 2024, at 8:15 a.m., Nurse Lucille Fraser **documented** . . .")] <u>with</u> [Doc. 31-1, p. 63 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 67 ("On July 23, 2024, at 9:28 a.m., ARNP Duane Cunningham **documented** an infirmary admission **note**: . . .")] <u>with</u> [Doc. 31-1, pp. 64-65 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 71 ("On July 24, 2024, at 9:01 a.m., Nurse Leslie Tyson **noted** . . .")] <u>with</u> [Doc. 31-1, pp. 68-69 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; <u>Compare</u> [Doc. 25, ¶ 72 ("Nurse Tyson **noted** that Mr. Oakie had a wet, non-

documents comprising the file central to her claims (which are all plainly focused on Oakie's medical treatment, see below) and she clearly does not dispute them. Accordingly, the file should be incorporated by reference and should inform the Court's consideration of this motion.

## III. PLAINTIFF FAILS TO STATE A CLAIM AGAINST THE DEFENDANTS FOR WHICH RELIEF CAN BE GRANTED

Plaintiff's allegations against each Defendant, as necessarily amended by Oakie's uncontested inmate medical file, or *arguendo* on their own, fail to state a claim against any of the Defendants for which relief can be granted.

---

productive cough and was dry heaving.)] with [Doc. 31-1, pp. 68-69 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 73 ("Nurse Tyson added a hepatitis panel and **noted** that labs were pending")] with [Doc. 31-1, pp. 68-69 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 75 ("At 9:14 a.m., ARNP Cunningham reviewed **the lab results, which reflected** the following . . .)] with [Doc. 31-1, pp. 70-71 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 76 ("Cunningham **noted** Mr. Oakie's vomit to be dark.")] with [Doc. 31-1, pp. 70-71 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 77 ("Cunningham **noted** Mr. Oakie's generalized abdominal discomfort)] with [Doc. 31-1, pp. 70-71 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 78 ("Cunningham **noted** that Mr. Oakie was suffering from "continued fever, nausea, vomiting.")] with [Doc. 31-1, pp. 70-71 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 79 ("Cunningham **documented** that Mr. Oakie was noncompliant with the NPO (nothing by mouth) status that had been ordered, noting that Mr. Oakie was drinking more than just sips of water")] with [Doc. 31-1, pp. 70-71 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 81 ("At 8:18 p.m., Mr. Oakie was seen by Nurse Andrea Younes, who **noted** that . . .")] with [Doc. 31-1, pp. 74-75 (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 82 ("On July 25, 2024, at 7:30 a.m., Nurse Leslie Tyson **documented** . . .")] with [Doc. 31-1, pp. 78-79) (reflecting, among other things, the exact notes in Plaintiff's allegation)]; Compare [Doc. 25, ¶ 83 ("At 7:00 p.m., Nurse Younes **documented** . . .")] with [Doc. 31-1, pp. 80-81 (reflecting, among other things, the notes in Plaintiff's allegation)].

### A. Relevant facts regarding Oakie's time at MCJ, as presented by the Amended Complaint and amended by incorporated evidence

At all times relevant, Jacob Oakie was a pre-trial detainee at the Marion County Jail (MCJ), whose deputies were under the authority of final policymaker, Sheriff Billy Woods. [Doc. 25, ¶¶ 14, 16]. Heart of Florida Health Center, Inc., is contracted to provide medical and healthcare services to inmates at the MCJ, such as Oakie. [Doc. 25, ¶ 20].

On June 20, 2024, Oakie was booked into the MCJ for allegedly violating his probation imposed following a conviction for possession of methamphetamine. [Doc. 25, ¶ 32]. At booking, he was severely underweight, [Doc. 25, ¶ 33]. HOF providers took his medical history, noting a recent emergency department visit and hand pain from a fall. [Doc. 25, ¶ 34]. Oakie was placed on a mental health watch list and housed in general population. [Doc. 25, ¶ 34]. On June 27, 2024, Oakie submitted a medical request form asserting that he was hypoglycemic and losing weight. [Doc. 25, ¶ 35]. Oakie was seen by medical staff on July 4 and found to have lost approximately 4 pounds, so weekly weight checks were ordered, as was a tuberculin skin test, and he was placed on a 3,000-calorie diet. [Doc. 25, ¶¶ 37-40].

On July 18, 2024, Oakie submitted a medical request form complaining of a "really bad ear infection" hurting him badly, and requested medicine "now." [Doc. 25, ¶ 42]. On July 19, 2024, Oakie was evaluated by Nurse

Rutland, to whom he reported that his left ear was swollen, painful, and intermittently draining, his left jaw was swollen and painful, he had a cold and was experiencing nasal congestion, cough, and body aches, and an 8 out of 10 pain level. [Doc. 25, ¶¶ 43-44]. Rutland observed that Oakie's ears were clean and free of drainage, with no notable swelling; and that Oakie had lost approximately 4 pounds. [Doc. 25, ¶¶ 45-46]. She prescribed ibuprofen and mucus relief medication, and told Oakie to return in three days if his condition worsened. [Doc. 25, ¶ 47]. Oakie returned to Nurse Rutland the following day, July 20, 2024, reporting increased left ear pain, so Rutland contacted the Charge Nurse, Tyson, and referred Oakie to the MCJ infirmary. [Doc. 25, ¶¶ 48-49]. Nurse Umba observed no ear drainage and ordered that Oakie continue with pain meds. [Doc. 25, ¶ 50]. On July 21, 2024, Oakie spoke to his mother on the phone, complaining of ear pain and claiming that he was not being given medication. [Doc. 25, ¶ 51].

On July 22, 2024, Oakie was seen by Nurse Gomez, to whom he complained that he was unable to hear out of his left ear, had head pressure, and had a cough that had lasted two weeks. [Doc. 25, ¶¶ 53]. Gomez documented that Oakie had lost a pound and he had a temperature of 99.1° F. [Doc. 25, ¶¶ 54-55]. Gomez diagnosed him with a common cold, and gave him Tylenol, cetirizine, continued NSAIDs, cough medication, and educated him to increase his water intake. [Doc. 25, ¶ 56]. Later that day, Oakie was seen by

Nurse Ramos, who observed that he was sweating profusely, and to whom he reported dizziness, nausea, vomiting, chills, cough, and pain in his head and left ear rated at 8 out of 10. [Doc. 25, ¶¶ 58-59]. Oakie was ordered held in the MCJ Infirmary for a 23-hour observation stay. [Doc. 25, ¶ 60]. That same day, Nurse Little documented that Oakie had a temperature of 99.7°F, a pulse of 112 beats per minute, dull body aches, and a decreased pain rating of 6 out of 10. [Doc. 25, ¶ 61].

On July 23, 2024, Oakie refused his breakfast tray. [Doc. 25, ¶ 63]. A few hours later, he was assessed by Advanced Registered Nurse Practitioner Cunningham, and was documented to have a fever of 101.8°F and to have vomited. [Doc. 25, ¶ 64]. Cunningham ordered that labs be taken immediately, including a complete metabolic panel (CMP), complete blood count (CBC) with differential, and blood cultures. [Doc. 25, ¶ 65]. An hour later, Cunningham documented in his infirmary note that Oakie had fever, cough, congestion, progressively worsening cold symptoms, left ear pain, weakness, nausea and vomiting starting overnight with a fever. [Doc. 25, ¶ 67]. Cunningham ordered IV fluids, a chest X-ray, Benadryl, Zofran, Ibuprofen, mucus relief, and cetirizine. [Doc. 25, ¶ 68]. An isolation order was also noted. [Doc. 25, ¶ 68]. The chest X-ray showed no acute findings, [Doc. 25, ¶ 69].

On July 24, 2024, Nurse Tyson noted Oakie had a fever of 102.1°F, a wet non-productive cough and was dry heaving. [Doc. 25, ¶¶ 71-72]. She ordered a

hepatitis panel to Oakie's pending labs, and prescribed allergy and nausea medication, Phenergan. [Doc. 25, ¶ 74]. About 10 minutes later, Nurse Cunningham reviewed Oakie's lab results, which were consistent with a systemic infection beyond a common cold. [Doc. 25, ¶ 75]. Cunningham also noted that Oakie's vomit was dark, he had generalized abdominal discomfort, that he had continued fever, nausea and vomiting, and that Oakie had not been compliant with the nothing-by-mouth order that was in place. [Doc. 25, ¶ ¶ 76-79]. Approximately twelve hours later that same day, Nurse Younes noted that Oakie complained of decreased hearing in his left ear and dizziness with ambulation. [Doc. 25, ¶ 81].

On July 25, 2024, at 7:30 a.m., Nurse Tyson documented that Oakie had a fever of 102.9°F with a temperature recheck at 8:45 a.m. showing it had reduced to 100.4°F. [Doc. 25, ¶ 82]. At 7:00 p.m., Nurse Younes documented that Oakie had abdominal tenderness and non-productive cough, a fever of 101.2°F, and that she observed him spitting in the toilet. [Doc. 25, ¶ 83]. Younes also documented that Oakie's next blood culture labs had come back negative. [Doc. 25, ¶ 83]. Oakie was alert and oriented x 3, his speech was clear, he reported 0/10 pain, he followed commands, and was ambulatory with a steady gate, but he still had decreased hearing in his left ear. [Doc. 31-1, pp. 80-81]. At no time did medical staff note that Oakie's escalating symptoms

from July 19, 2024, to July 25, 2024, were consistent with otomastoiditis progressing to meningitis. [Doc. 25, ¶ 85].

In the early morning hours of July 26, 2024, Oakie was in the jail infirmary continuing to exhibit the same symptoms, but now in an altered mental state. [Doc. 25, ¶ 86]. Oakie told staff that he wanted to return to his pod, so they explained the discharge process to him and told him he would need to speak with the medical provider first. [Doc. 25, ¶ 87; Doc. 31-1, p. 83]. Oakie then began yelling that he wanted to leave and hitting the glass of his cell, which he continued to do for several more hours. [Doc. 25, ¶ 87; Doc. 31-1, p. 83]. At 1:58 a.m., Oakie notified staff that he had removed his IV. [Doc. 25, ¶ 87; Doc. 31-1, p. 83]. The IV site was covered with gauze and tape and a refusal form was completed. [Doc. 31-1, p. 83].

At 3:30 a.m., Nurse Younes educated Oakie on the importance of the IV and twice asked if one could be inserted, but Oakie did not respond. [Doc. 31-1, p. 84]. MCSO Deputy Custodio asked Oakie if a nurse could insert an IV but was also ignored. [Doc.31-1, p. 84]. At 4:37 a.m., Nurse Younes weighed Oakie on a standing scale to be 104.6 lbs. [Doc. 31-1, p. 86]. At approximately 5:10 a.m., Custodio ordered Oakie to stop kicking the cell door and to turn around and submit to hand restraints, but in his altered mental state, Oakie did not understand or comply with the orders. [Doc. 25, ¶ 89]. Custodio sprayed Oakie with pepper gel. [Doc. 25, ¶ 90]. MCSO Deputies Gordon and Iovino responded

and placed Oakie in hand restraints. [Doc. 25, ¶ 91]. Oakie was then decontaminated in a shower [Doc. 25, ¶ 92]. By 5:40 a.m., Nurse Younes had completed a post use of force medical assessment, during which Oakie did not answer questions but was compliant with commands. [Doc. 31-1, p. 88]. No injury was noted. [Doc. 31-1, p. 88].

At 7:41 a.m., Nurse Ramos dialed 911, and at 8:02 a.m., Oakie was transported to AdventHealth Ocala at the direction of Dr. Rodriguez who had determined that Oakie was in an altered mental state and at risk of sepsis. [Doc. 25, ¶¶ 94-95; Doc. 31-1, p. 89]. At AdventHealth Ocala, Oakie was admitted to the emergency department. [Doc. 25, ¶¶ 96]. Subsequent CT imaging revealed findings consistent with meningitis, with otomastoiditis as the source of the infection. [Doc. 25, ¶¶ 97-98]. Cultures now revealed that the bacterial infection was caused by streptococcus pneumoniae. [Doc. 25, ¶ 100]. On July 28, 2024, Jacob Oakie's family requested transition to comfort care only, and a hospice order was placed. [Doc. 25, ¶ 102]. Oakie passed away at 8:48 p.m. that day from respiratory failure with hypoxia caused by streptococcal meningitis. [Doc. 25, ¶ 103]. Meningitis is a treatable disease and if Oakie had received appropriate antibiotics sooner, he would have had an increased chance of survival. [Doc. 25, ¶ 105-106].

## IV. PLAINTIFF FAILS TO ESTABLISH DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL NEED

The Eighth Amendment's prohibition on "cruel and unusual punishment" requires that states provide at least "minimally adequate medical care" to confined persons. Sparks v. Ingle, 724 Fed. Appx. 692, 693 (11th Cir. 2018). "The Fourteenth Amendment prohibits cruel and unusual punishment to pretrial detainees under the same standards as the Eighth Amendment." Colardo-Keen v. Rockdale County, Georgia, 2019 WL 2245922, at *6 (11th Cir. May 24, 2019) (citing Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007)).

To establish constitutionally inadequate medical care, a plaintiff must prove: (1) an objectively serious medical need; (2) deliberate indifference to that need by the defendant; and (3) causation between the defendant's indifference and the injury sustained. Nam Dang v. Sheriff, Seminole County Fla., 871 F.3d 1272, 1279 (11th Cir. 2017). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 1280. "[T]he medical need must be one that, if left unattended, poses a substantial risk of serious harm." Id. To establish deliberate indifference, a plaintiff must prove each defendant's: (1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than

mere negligence. Nam Dang, 871 F.3d at 1280 (11th Cir. 2017) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)).

The first element, subjective knowledge of the risk, requires not only that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but the defendant "must also draw the inference." Nam Dang, at 1280. In other words, "[a] plaintiff must produce facts showing that each defendant "actually drew th[e] inference" that his or her "present course of treatment presented a substantial risk of serious harm . . . but persisted in the course of treatment anyway." Campbell v. Sikes, 169 F.3d 1353, 1370 (11th Cir. 1999); see also Betts v. Santa Rosa Cty. Sheriff, 2017 WL 526055, at *3 (11th Cir. 2017) (affirming summary judgment where the "[plaintiff] did not show that [the doctor] subjectively knew of a risk of serious harm and deliberately provided her with inadequate treatment [anyway]."). "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference and each individual defendant must be judged separately and on the basis of what that person knew." Nam Dang, 871 at 1280.

The second and third elements require that a defendant's response to such knowledge "be more than an inadvertent failure to provide adequate medical care, negligence in diagnosis or treatment, or medical malpractice." McLeod v. Sec'y, Florida Dep't of Corr., 679 Fed. Appx. 840, 843 (11th Cir. 2017). Rather, care must be "so grossly incompetent, inadequate, or excessive

as to shock the conscience or to be intolerable to fundamental fairness." Harris, 941 F.2d 1495, 1505 (11th Cir.1991). For example, a defendant who knows of a serious condition but completely denies treatment or provides treatment so slight and cursory that it "amounts to no treatment at all," may be liable for deliberate indifference. Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994); Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989).

Where an inmate has received medical treatment, federal courts are reluctant to question the accuracy or appropriateness of the medical judgments that were made. Harris, 941 F.2d at 1507; see also Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995) ("Whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment"); Maglio v. Bhadja, 257 Fed. Appx. 234, 235-36 (11th Cir. 2007) (finding no deliberate indifference where staff "provided some treatment, but diagnosed and treated [the plaintiff] incorrectly."); Jean-Ewoll v. Reyes, 3:15CV202/LAC/EMT, 2019 WL 637166, at *8 (N.D. Fla. Jan. 14, 2019) ("Ordinarily, there is no constitutional violation when some measure of treatment is provided."). To do otherwise would be "to constitutionalize claims that sound in tort law." Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (quotation omitted).

### A. Serious Medical Need

Here, Plaintiff establishes that Oakie eventually had a serious medical need, but not until Dr. Rodriguez recognized that he was in an altered mental state and at risk of sepsis around 7:41 a.m. on July 26. Prior to that point, Oakie had only been diagnosed with a common cold approximately four days before. Although Oakie then began experiencing worsening (and occasionally improving) symptoms following that cold diagnosis, HOF medical professionals had been actively ordering and reviewing diagnostic imaging and lab tests to try and determine the cause of those symptoms (as well as monitoring and treating Oakie with medication and IV fluids to control them), but without success.

### B. No Deliberate indifference

With respect to the serious medical need recognized by Dr. Rodriguez, Plaintiff fails to establish deliberate indifference. When Rodriguez noted Plaintiff's altered mental state and risk of sepsis, he sought emergency medical transport for Oakie to a nearby hospital. To any extent Plaintiff's claim relies on a theory that Oakie's altered mental state made a serious medical need apparent earlier in the morning on July 26, such a claim also fails. Although *arguendo* it may be plausibly alleged that Oakie's mental state had become altered at that time, there is no factual basis whatsoever for an inference that anyone with HOF or MCSO had subjective knowledge that such was the case,

or that Oakie's condition posed a serious risk of harm, until Dr. Rodriguez recognized it as discussed above around 7:41 a.m.

To the contrary, while Oakie's behavior earlier that morning may arguably have been **caused** by an altered mental state, Oakie **outwardly displayed** only clear, coherent behavior consistent with a belligerent jail inmate that was not getting what he wanted: First, by telling staff that he wished to leave the infirmary and go back to his pod, and then, after it was explained to him that there was a discharge process and he would have to wait, by yelling that he wanted to leave, striking the glass of his infirmary cell, and eventually removing his own IV. Then, after Nurse Younes came and explained to Oakie the risk associated with not having an IV, and both Younes and Deputy Custodio tried to convince him to allow insertion of a new IV line, Oakie responded by giving them both the silent treatment and then resumed yelling and striking his infirmary cell door.

Particularly with respect to Defendant Custodio's, Gordon's, and Iovino's knowledge and perception of Oakie's actions, it should also be recognized that they are corrections officers, not medical professionals. Confronted with Oakie's apparent and ongoing belligerence and disruptions in the form of yelling and striking his infirmary cell door, Custodio gave him lawful commands to cease and submit to hand restraints—both of which, he defied. At the point that Custodio applied pepper spray, she had been presented with

nothing to suggest that Oakie's defiance was prompted by anything other than a willful and knowing decision on Oakie's part—a decision that was logically in line with the silent treatment he had given her 90 minutes earlier and also in line with his ongoing belligerence. Although Oakie was in the infirmary, he was clearly physically well enough to repeatedly yell his demands and repeatedly kick his cell door. As for Gordon and Iovino, who simply responded post-pepper spray and placed Oakie in hand restraints, they had no prior involvement or knowledge of Oakie at all, except that they were responding and placing Oakie in restraints in order to take him to the decontamination shower and address the medical concern they **did** know about: his having been pepper sprayed.

Regardless of the precise theory of alleged serious medical need under which Plaintiff tries to advance her claim (whether discussed above or not), her claim is plainly limited by the facts at bar to attacking the medical judgment surrounding Oakie's treatment and therefore she cannot establish deliberate indifference. Harris, 941 F.2d at 1507; Maglio, 257 Fed. Appx. at 235-36. Whether Plaintiff's allegations are amended by the evidence incorporated by reference or on their own, they establish that medical staff were responsive to Oakie throughout his time at the MCJ. First, by increasing the calories in his meals in response to his request shortly after intake; next by repeatedly evaluating him and treating him for symptoms that they believed were

indicative of his having a common cold when he began reporting those symptoms; then by escalating their treatments in conjunction with various, investigative diagnostic testing as those symptoms worsened, and finally by escalating his treatment to a nearby hospital when a serious medical need was recognized. This leaves only the matter of the medical staff's medical judgment and thus Plaintiff cannot establish deliberate indifference. See Poag, 61 F.3d at 1545. All of Plaintiff's § 1983 claims fail for lack of a constitutional violation.

## V. PLAINTIFF ALSO FAILS TO ESTABLISH § 1983 SUPERVISORY LIABILITY OR MONELL[4] LIABILITY FOR OTHER REASONS

Plaintiff's §1983 supervisory liability and Monell liability claims also fail for her failing to establish the requisite elements of involvement and causal connection in those causes of action.

Supervisory officials cannot be held liable in their individual capacity under § 1983 based solely on their supervisory position or under a theory of respondeat superior. Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). Rather, a plaintiff must allege facts plausibly showing that the supervisor either personally participated in the alleged constitutional violation, or that a causal connection exists between the supervisor's conduct and the alleged constitutional violation. See Braddy v. Fla. Dep't of Lab. and Emp. Sec., 133 F. 3d 797, 802 (11th Cir. 1998) (citing Brown, 906 F.2d at 671). Absent direct

[4] Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978).

involvement, a plaintiff must allege "a history of widespread abuse [that] puts the responsible supervisor on notice of the need to correct the alleged deprivation, and that he fails to do so." See Brown, 906 F.2d at 671. "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences . . . . In addition, the causal connection may be established and supervisory liability imposed where the supervisor's improper custom or policy . . . result[s] in deliberate indifference to constitutional rights." Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). "The standard by which a supervisor is held liable in their individual capacity for the actions of a subordinate is extremely rigorous." Braddy, 133 F.3d at 802.

Official capacity Monell liability under § 1983 likewise cannot arise under a theory of respondeat superior. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). To sustain her Monell claim against Sheriff Woods, in addition to a constitutional violation (which, again, has not been established here), Plaintiff must show that Sheriff Woods had a custom or policy that constituted deliberate indifference to that constitutional right and that the policy or custom caused the violation. See McDowell v. Brown, 392 F. 3d 1283, 1289 (11th Cir. 2004). To establish a policy, custom or practice under Monell, a plaintiff can: (1) identify an official policy; (2) identify an unofficial custom or widespread

practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identify a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty., Fla., 48 F.4th 1222, 1229 (11th Cir. 2022)."[T]he bar to establish municipal liability is very high." Simmons v. Bradshaw, 879 F.3d 1157, 1169 (11th Cir. 2018). Therefore, in reviewing Plaintiff's Monell claim against Sheriff Woods, "rigorous standards of culpability and causation must be applied to ensure" that he is not held liable solely under a theory of respondeat superior. See Bd. of County Comm'r v. Brown, 520 U.S. 397, 405 (1997)

Here, beyond failing to establish a constitutional violation, Plaintiff fails to establish supervisory liability because she fails to show direct supervisory involvement by a Defendant or the existence of abuse that was "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." Likewise, with respect to her Monell claim, although Plaintiff's allegations regarding her medical treatment pay lip service to the idea of formal policy, they are entirely conclusory. The only specific allegations Plaintiff offers are geared towards vague customs or practices and are premised entirely upon the opinion of one Mary Coy. As alleged, Coy reported

unbounded, un-identified matters[5] consisting entirely of conclusory summations of, what are at best, instances of medical treatment that are unrelated to the acts complained of here and in no way rise to specific events involving constitutional violations. Indeed, from the limited context provided, the reports themselves were concerned with the medical judgment of HOF medical providers, not deliberate indifference, where, as alleged, they arose from a difference in opinion between Ms. Coy, a nurse, and Dr. Pearson, a more medically trained and proficient HOF physician who explained to MCSO that Coy's concerns were unfounded.

[5] The complete lack of specificity, both as to time and specific events, are each fatal to Plaintiff's efforts to establish a custom or practice. Generally, "random acts or isolated incidents are insufficient to establish a custom or policy." Id. A custom is defined as "a practice that is so settled and permanent that it takes on the force of the law." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) "For constitutional violations to be sufficiently 'widespread' for a governmental supervisor to be held liable, they need occur with frequency." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1294 (11th Cir. 2004) (quotation omitted); See Khoury v. Miami-Dade Cty. Sch. Bd., 4 F.4th 1118, 1132 (11th Cir. 2021) (holding that previous incidents that occurred three years before were too remote to establish a custom for municipal liability); Church v. City of Huntsville, 30 F.3d 1332, 1346 (11th Cir. 1994) (holding that incidents that occurred "a year or more" before the incident at issue could not support a finding that a custom existed); Clark v. Evans, 840 F.2d 876, 885 (11th Cir. 1988) (holding four cases of unconstitutional conduct over a course of four years would be insufficient to put policymaker on notice of unconstitutional custom); Alimenti v. Town of Howey-In-The-Hills, No. 5:20-cv-386-CEH-PRL, 2023 U.S. Dist. LEXIS 48845, (M.D. Fla. Mar. 22, 2023) (holding two prior incidents that occurred more than two years prior to incident were too remote in time to establish a custom); Smith v. City of Moultrie, No. 6:06 - CV-39WLS, 2007 U.S. Dist. LEXIS 66300, 2007 WL 2668138, at *2 (M.D. Ga. Sept. 6, 2007) (describing complaints about an officer's prior misconduct as "too remote" to establish Monell liability where the most recent complaint was filed over a year prior to the alleged constitutional violation); Mindler v. Clayton Cnty., 831 F. Supp. 856, 862 (N.D. Ga. 1993) (finding that "three remotely comparable allegations of similar conduct" over a "six year period preceding the incident in question" was insufficient to create a question of fact as to municipal liability.").

## VI. THE INDIVIDUAL CAPACITY DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

With respect to § 1983 claims, qualified immunity "shields a government official from liability unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known." Piazza v. Jefferson County, Ala., 923 F.3d 947, 951 (11th Cir. 2019). "To be eligible for qualified immunity, the official must first establish that he was performing a 'discretionary function' at the time the alleged violation of federal law occurred. Crosby, 394 F.3d at 1332.

Here, there can be no question that the individual-capacity Defendants were performing a discretionary law enforcement function with respect to their actions. Therefore, Plaintiff bears the burden of establishing a Defendant's violation of a clearly established right in order to overcome that Defendant's qualified immunity. As shown above, no constitutional violation occurred, but even assuming *arguendo* that one did, Plaintiff fails to establish the associated Defendant's actions violated a clearly-established right and every individual-capacity Defendant is entitled to qualified immunity from Plaintiff's § 1983 claims.

## VII. PLAINTIFF'S WRONGFUL DEATH CLAIM IS BARRED FOR FAILURE TO COMPLY WITH FLORIDA LAW AND BY SOVEREIGN IMMUNITY.

The factual allegations underlying the incident in this case show that Plaintiff's wrongful death / negligence claim against Sheriff Woods clearly

arises out of the rendering of medical care and treatment by HOF and its staff as the contracted-for MCJ health care provider. Consequently, Plaintiff was required to comply with the pre-suit conditions of Chapter 766, Florida Statutes, including *inter alia*, its pre-suit investigation and notice requirements. See, e.g., §§ 766.104, .106, Fla. Stat. At no time did Plaintiff engage in the required pre-suit investigation into the matters giving rise to her claims of wrongful death / negligence, nor furnish the required notice of intent. Because Plaintiff has not complied with any of the provisions set forth in Chapter 766, Florida Statutes, her wrongful death / negligence claim should be dismissed.

Plaintiff's barebones allegations also appear to claim that Sheriff Woods somehow directly breached a duty of care vis-à-vis his policy decisions. The vaguely alleged duties of care relied upon by Plaintiff in that regard did not exist for individuals at common law and, as alleged, are premised upon Sheriff Wood's discretionary decisions. Thus, he is entitled to sovereign immunity against those claims. See City of Freeport v. Beach Comty. Bank, 108 So.3d 684, 687 (Fla. 1st DCA 2013) ("[W]here governmental actions are deemed discretionary, as opposed to operational, the government has absolute immunity from suit."); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010, 1021 (Fla. 1979) ("Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level

functions are those that implement policy."); Dunagan v. Seely, 533 So.2d 867, 869 (Fla. 1st DCA 1988) ("[T]he making of policies and procedures" regarding inmates is a discretionary function to which sovereign immunity does attach."); see also Trianon Park, 468 So. 2d at 917 (Section 768.28's "sole purpose was to waive that immunity which prevented recovery for breaches of existing common law duties of care.").

## VIII. CONCLUSION

All of Plaintiff's claims against the moving Defendants are due to be dismissed for the reasons state herein.

Respectfully submitted this 31st day of August 2026.

**/s/ Brandon W. White**

William B. Armistead, Esq.
(FBN: 88535)
Brandon W. White, Esq.
(FBN: 84788)
warmistead@coppinsmonroe.com
bwhite@coppinsmonroe.com
kwillis@coppinsmonroe.com
kflemming@coppinsmonroe.com
COPPINS MONROE, P.A.
2316 Killearn Center Blvd., Ste. 202
Tallahassee, FL 32309
Office: 850-422-2420 Fax: 850-422-2730

ATTORNEYS FOR DEFENDANT BILLY WOODS, SHERIFF OF MARION COUNTY, FLORIDA, IN HIS OFFICIAL CAPACITY, CAPTAIN BRIAN SPIVEY, OFFICER N.

CUSTODIO ("CUSTODIO"), DEPUTY GORDON ("GORDON"), AND DEPUTY IOVINO ("IOVINO")

## LOCAL RULE 3.01(g) CERTIFICATE

I hereby certify that on August 31, 2026, I conferred by email with counsel for Plaintiff, James Slater, Esq., and he advised that Plaintiff opposes the relief sought in this motion.

**/s/ Brandon W. White**

## CERTIFICATE OF SERVICE

Pursuant to Federal Rules of Civil Procedure 5(b), this document is filed electronically, and service shall be through the Court's transmission facilities on all persons appearing before this Court.

**/s/ Brandon W. White**