UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

MARILYN OAKIE,

Plaintiff,

v.

BILLY WOODS, et al.,

Defendants.

Case No. 5:26-cv-00405

**PLAINTIFF'S RESPONSE TO DEFENDANTS HEART OF FLORIDA, PEARSON, RODRIGUEZ,[1] LITTLE, RUTLAND, GOMEZ, RAMOS, CUNNINGHAM, TYSON, AND YOUNES' MOTION TO DISMISS (ECF 29)**

[1] Plaintiff's Amended Complaint does not contain any claims against Dr. Jose Rodriguez.

Now Comes Plaintiff, by and through her attorneys, responding to Heart of Florida Health Center, Inc., Dr. John Pearson, John Little, Colleen Rutland, Sandy Gomez, Dorisvel Ramos, Duane Cunningham, Leslie Tyson, and Andrea Younes' motion to dismiss Plaintiff's Amended Complaint. Plaintiff states as follows:

## INTRODUCTION

Jacob Oakie spent the last week of his life in the Marion County Jail infirmary, in the care of Heart of Florida Health Center, Inc. (HOF). HOF practitioners watched an ear infection progress toward fatal meningitis. They documented his severe and worsening symptoms, as well as labs indicating a systemic infection. They responded with non-prescription medications and a diagnosis of "common cold." None of them called a physician or sent him to a hospital. By the time a nurse called 9-1-1, it was too late, and he passed away. This care was so cursory it amounted to no care at all, and the Amended Complaint states a deliberate indifference claim against each practitioner. These providers independently made the same choice, which reflects HOF's custom of withholding necessary care and hospital transfers to save the County money. Dr. John Pearson, HOF's Chief Healthcare Administrator for Inmate Health, was warned repeatedly of this custom by Mary Coy, the jail's Medical Services Liaison. He did nothing to correct it, so HOF's custom of depriving detainees medical care persisted during Mr. Oakie's detention. These allegations plausibly plead municipal liability against HOF and supervisory liability against Dr. Pearson. The motion should be denied.

## FACTUAL BACKGROUND

When Jacob Oakie was booked into the Marion County Jail on June 20, 2024, he was severely underweight with a BMI of 16.1. ECF 25 ¶ 33. On June 27, 2024, Mr. Oakie submitted an Inmate Medical Request Form stating he is hypoglycemic and losing weight, but was not seen until July 4, 2024, 7 days later, at which point his BMI had decreased to 15.5. *Id.* ¶¶ 35-36. MCJ medical staff ordered weekly weight checks, a tuberculin skin test, and a 3,000-calorie diet for Mr. Oakie. *Id.* ¶¶ 37-40. Mr. Oakie was not seen by medical staff again until July 19, 2024. *Id.* ¶ 41.

### A. Mr. Oakie died due to meningitis because, while at the MCJ, he did not receive medical care for his obviously serious symptoms of meningitis.

On July 18, 2024, Mr. Oakie submitted another Inmate Medical Request Form documenting a "really bad" and painful ear infection. *Id.* ¶ 42. On July 19, 2024, Nurse Rutland evaluated him. Mr. Oakie reported that his left ear was swollen, painful, and intermittently draining, he had a cold, his jaw was painful, and his pain level was at an 8 out of 10. *Id.* ¶ 44. His BMI had also dropped further to 14.9. Id. ¶ 45. Finding nothing in the ear to explain Mr. Oakie's symptoms, Rutland ordered no additional tests, did not contact a physician to evaluate him, prescribed ibuprofen and mucus relief, and told him to return in three days if his condition worsened. *Id.* ¶¶ 46-47. Mr. Oakie returned to Rutland the next day on July 20, 2024, reporting increased ear pain, after which she contacted the charge nurse, Nurse Tyson, and referred him to the infirmary. *Id*. ¶¶ 48-49. Nurse Mbayo Umba also found nothing in the ear itself to explain the symptoms but took no further action except instructing

him to continue with pain medications. *Id.* ¶ 50. On July 21, 2024, Mr. Oakie reported his ear pain to his mother and that he had not been given medications. *Id.* ¶ 51. No medical staff assessed or treated him then. *Id.* ¶ 52.

On July 22, 2024, at 11:04 a.m., Mr. Oakie was seen by Nurse Sandy Gomez, where he complained of being unable to hear out of his left ear, with head pressure and a cough lasting two weeks. *Id.* ¶ 53. Mr. Oakie had a fever of 99.1°F and weighed 103 pounds with a BMI of 14.8. *Id.* ¶¶ 54-55. Nurse Gomez diagnosed Mr. Oakie with a "common cold," gave him Tylenol, cetirizine, continued NSAIDs, cough medication, and instructed him to increase water intake. *Id.* ¶ 56. At 4:10 p.m., Mr. Oakie reported dizziness, nausea, vomiting, chills, cough, earache, a sharp pain in his head and left ear, and a pain rating of 8 out of 10 to Nurse Dorisvel Ramos. *Id.* ¶¶ 57-58. Ramos observed him sweating profusely. *Id.* ¶¶ 59-60. At 7:28 p.m. that night, Nurse John Little documented that Mr. Oakie had a fever of 99.7°F, pulse of 112 beats per minute (high), dull body aches, and a pain rating of 6 out of 10. *Id.* ¶ 61. On July 22, Nurses Little, Ramos, and Gomez knew Mr. Oakie had been very sick for four days without improvement, but they did not notify a higher-level provider, develop a treatment plan, or facilitate transfer to an outside provider.

On July 23, 2024, Mr. Oakie refused his breakfast tray in the early morning and Nurse Fraser documented vomiting and a fever of 101.8°F. *Id.* ¶¶ 63-64, 66. Following an evaluation of Mr. Oakie, ARNP Duane Cunningham ordered labs, including complete metabolic panel (CMP), complete blood count (CBC) with differential, and blood cultures, the first laboratory studies ordered for Mr. Oakie

during his treatment. *Id.* ¶¶ 65-66. Later that night, ARNP Cunningham documented Mr. Oakie's progressively worsening symptoms of fever, cough, left ear pain, weakness, nausea and vomiting. *Id.*¶ 67. Cunningham ordered IV fluids, chest X-ray, Benadryl, Zofran, Ibuprofen, mucus relief, and cetirizine. *Id.*¶ 68. The chest X-ray showed no acute findings, but no other tests were ordered. *Id.* ¶ 69. The lab results came in on July 23, 2024; Cunningham reviewed them the next day. *Id.* ¶ 70.

On July 24, 2024, at 9:01 a.m., Nurse Tyson documented Mr. Oakie's 102.1°F fever, a wet, non-productive cough, and dry heaving. *Id.* ¶¶ 71-72. Tyson ordered a hepatitis panel and prescribed allergy and nausea medication. *Id.* ¶ 73. ARNP Cunningham reviewed the lab results, which had several concerning findings, including liver stress and inflammation, low hemoglobin, high glucose, severely elevated white blood cells, and critically elevated neutrophils. *Id.* ¶ 75. Cunningham also noted other symptoms that signaled severe systemic infection, including dark vomit, abdominal discomfort, continued fever, nausea, and inability to drink water. *Id.* ¶¶ 75-79. Cunningham did not notify a physician of these worsening symptoms, develop a treatment plan, or facilitate transport to a hospital. *Id.* ¶ 80. Nurse Younes saw Mr. Oakie that night and noted decreased hearing in Mr. Oakie's left ear and dizziness but did not take any steps to address his deteriorating health. *Id.* ¶ 81.

On July 25, 2024, Nurse Tyson took Mr. Oakie's temperature twice, finding a fever of 102.9 and 100.4°F. *Id.* ¶ 82. Later that day, Nurse Younes found a fever of 101.2°F, and noted abdominal tenderness, non-productive cough, negative blood

cultures, and Mr. Oakie spitting into the toilet. *Id.* ¶ 83. Despite a *fourth day* of significant fever and other worsening symptoms, Tyson and Younes did not notify a nurse practitioner or physician, did not develop a treatment plan, and did not facilitate transfer to a hospital. *Id.* ¶ 84. Mr. Oakie was seen independently by multiple nurses and one nurse practitioner between July 19 and July 25, but not a single one investigated the escalating constellation of symptoms—severe ear pain, jaw swelling, high fever, hearing loss, elevated WBC, vomiting, dizziness, and neurological changes—as consistent with otomastoiditis progressing to meningitis, nor did they take steps to transfer him to a hospital for evaluation. *Id.* ¶ 85.

On July 26, 2024, Mr. Oakie's symptoms continued, and he began to exhibit an altered mental state. *Id.* ¶ 86. Around 2 a.m., he refused his IV and began to yell and hit the glass of his cell, continuing this behavior for several hours. *Id.* ¶ 87. Finally, deputies came to his cell, but they were not there to help him get the medical attention he needed. *Id.* ¶ 88. Deputy Custodio almost immediately ordered him into restraints, which Mr. Oakie could not comply with due to his medical distress and altered mental state, prompting Custodio to spray him with pepper gel. *Id.* ¶¶ 88-90. Nurse Ramos arrived at his cell at 7:41 a.m. and finally called 9-1-1. *Id.* ¶ 94. Mr. Oakie was diagnosed with meningitis shortly after arriving at the hospital and entered respiratory distress during an MRI. *Id.* ¶¶ 96-100. He died on July 28, 2024, of respiratory failure with hypoxia caused by streptococcal meningitis. *Id.* ¶ 103.

### B. HOF and Dr. Pearson allow unconstitutional practices that deprive detainees of health care to persist throughout MCJ.

Mr. Oakie's lack of medical care was consistent with Heart of Florida Health Center, Inc.'s (HOF) custom of depriving inmates of medical care. HOF contracted with Sheriff Billy Woods to provide healthcare services to inmates at MCJ. ECF 25 ¶ 20. As the contracted medical provider, HOF was responsible for ensuring constitutionally adequate medical care for all inmates in its custody, including timely diagnosis, treatment, and referral of serious medical conditions. *Id.* ¶ 126.

HOF's contract with MCSO and other municipalities for jail healthcare caused its revenue to increase by nearly $20 million in two years. *Id.* ¶ 122. But HOF has caused frequent medical staffing shortages at MCJ and failed to meet Florida Model Jail Standards for timely handling of inmate complaints. *Id.* ¶ 123. Shortages have often left only one registered nurse responsible for both infirmary monitoring and intake assessments at MCJ. *Id.* ¶ 124. Approximately four people die in MCJ per year—about four times the national average. *Id.* ¶ 107. Significant noncompliance with jail medical standards has been reported. *Id.* ¶ 108. Post-booking hospital visits in 2023 and 2024 dropped to less than half of historic levels, which is consistent with HOF's custom of depriving detainees of necessary transfers to the hospital to save money for its contracting municipality—Marion County. *Id.* ¶ 125. When a detainee requires medical treatment by an outside provider, Marion County is responsible for paying the medical expenses. *Id.* ¶ 109. Accordingly, medical staff are routinely discouraged from transporting sick detainees to outside medical facilities. *Id.* ¶ 111.

This custom of depriving detainees of medical care, the multiple incidents it has caused, and defendants' notice thereof are illustrated in Plaintiff's Amended Complaint primarily through the many grievances of a whistleblower, Mary Coy, who described care in MCJ as "punitive medicine." *Id.* ¶ 135. Ms. Coy, a Registered Nurse with approximately 35 years of experience, served as MCJ's Medical Services Liaison. *Id.* ¶¶ 129–130. Her responsibilities included investigating inmate medical grievances and auditing HOF's compliance with Florida's Model Jail Standards. *Id.*

Dr. John Pearson was the Chief Healthcare Administrator for Inmate Health at MCJ and an agent of HOF. *Id.* ¶ 19. Ms. Coy repeatedly made Dr. Pearson aware of the lapses in inmate care at MCJ. *Id.* ¶ 138. Ms. Coy wrote a letter to supervisors where she reported detainee medical care had degraded so significantly that inmates were being denied healthcare. *Id.* ¶ 133. She reported healthcare deficiencies, and that there were "lots of documentations of inmates suffering for hours before horrific things happen to them regarding their medical needs." *Id.* ¶ 133. She described the environment as "toxic," stating she was "tired of reading in documentation and hearing from inmates and staff of what is inhumane treatment." *Id.* ¶ 134.

Rather than address her concerns, Dr. Pearson wrote a letter to Captain Brian Spivey on December 5, 2022, criticizing Ms. Coy for questioning practitioners' treatment plans. *Id.* ¶ 139. He stated that "doctors provide treatment which is medically appropriate, but not necessarily what inmates want or desire." *Id.* He took no reasonable steps to address Ms. Coy's legitimate concerns about the treatment of

inmates. *Id.* ¶ 140. Instead, Dr. Pearson recommended Ms. Coy's termination because she advocated for humane treatment of inmates. *Id.* ¶ 141. Dr. Pearson's dismissal of Ms. Coy's concerns and his recommendation that she be terminated allowed the inhumane treatment of inmates to continue. *Id.* ¶ 142. Dr. Pearson's recommendation was ultimately followed, as Ms. Coy was terminated as a result of her repeated criticisms of the healthcare being provided at MCJ. *Id.* ¶ 151.

## STANDARD OF REVIEW

Rule 12(b)(6) requires a complaint to provide "more than . . . a formulaic recitation of the elements of a cause of action," but it "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). The Court must accept all well-pleaded facts as true, drawing all reasonable inferences in Plaintiff's favor. *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994). So construed, the complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted). This "is not akin to a 'probability requirement'"; the plaintiff need only allege "'enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

### A. Defendants were deliberately indifferent to Oakie's serious medical need.

Plaintiff has pled sufficient facts to support a claim against multiple HOF practitioners. To establish liability on a deliberate indifference claim, a plaintiff must

satisfy an objective and a subjective element. The plaintiff must first "demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). Second, the plaintiff must demonstrate that the defendant exhibited "subjective recklessness as used in the criminal law," which means simply that the "defendant actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm" from that medical condition. *Id.* (quotations omitted).

A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Howard v. Wilkinson*, 305 F. Supp. 3d 1327, 1335 (M.D. Fla. 2018) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Mr. Oakie's medical need was objectively serious, as he had contracted a bacterial infection, which was ultimately deadly, that caused him to exhibit distressing symptoms for over a week, sustain a fever for several days, and return lab results reflecting a serious infection. ECF 25 ¶¶ 75, 84-85, 98, 104. Defendants do not contest that Mr. Oakie had a serious medical need. ECF 29 at 8-9.

Over the course of his final eight days in MCJ, Mr. Oakie was seen by multiple HOF practitioners who exhibited deliberate indifference. When the "medical care provided was so cursory as to amount to no treatment at all," it can constitute deliberate indifference. *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir. 1985). This is precisely the type of care Mr. Oakie received. While he was seen by nurses and one nurse practitioner in the MCJ infirmary, they never provided

treatment that addressed his condition, which was obviously declining. He received nothing more than non-prescription medications as his severe, systemic infection was treated as a mere common cold.

In *Ancata*, the prisoner complained of serious symptoms—ankle swelling, inability to sleep, chills, lower back pain, tingling and numbness of his hands, hyperventilation, severe pain, and double vision—but the jail's medical providers did nothing but provide him with non-prescription medication. That was sufficient to state a deliberate indifference claim, and the Eleventh Circuit reversed dismissal because that care was so cursory, it amounted to no care at all. *Id*. The *Ancata* court also quoted a Third Circuit case, *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978), to demonstrate this type of 'cursory' treatment:

> Although the plaintiff has been provided with aspirin, this may not constitute adequate medical care. If, "deliberate indifference caused an easier and less efficacious treatment" to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care.

*Id*. In *West*, the prisoner received aspirin to treat his reports of leg pain after an operation. *West*, 571 F.2d at 162. Such ineffective treatment created a plausible inference of deficient care, so the court reversed dismissal. *Id*. As the *Ancata* and *West* plaintiffs, Mr. Oakie complained of and demonstrated serious symptoms—dizziness, sharp pain in his head and left ear, dry heaving, inability to drink water, elevated heart rate, weakness, cough, vomiting, high fever, and weight loss. His labs showed signs of a serious infection. Yet, his providers—Cunningham, Rutland, Little, Ramos, Gomez, Tyson, and Younes—failed to meaningfully address his illness.

***Nurse Rutland***. On July 19, 2024, Nurse Rutland evaluated Mr. Oakie after he submitted a medical request describing a "really bad ear infection" that was "hurting horribly." ECF 25 ¶¶ 42–44. Mr. Oakie reported that his left ear was swollen, painful, and intermittently draining; that his left jaw was swollen and painful; that he had a cough and body aches; and that his pain was 8 out of 10. *Id.* ¶ 44. His BMI had dropped to 14.9 and his weight to 104 pounds. *Id.* ¶ 45. Despite these symptoms, Nurse Rutland, after merely confirming no abnormalities within the ear itself, prescribed only ibuprofen and mucus relief, and told Mr. Oakie to return in three days if his condition worsened. *Id.* ¶¶ 46–47. The next day, he informed Rutland that his pain had increased, at which point she referred him to the infirmary—but no treatment plan was developed, no diagnostic testing was ordered, and no higher-level provider was consulted. *Id.* ¶¶ 48–50. Rutland had knowledge of Mr. Oakie's severe ear pain, jaw swelling, dangerously low BMI, and reported symptoms, yet did nothing more than prescribe over-the-counter medication.

***Nurses Little, Ramos, and Gomez.*** Since July 18, 2024, Nurses Little, Ramos, and Gomez had knowledge that Mr. Oakie had been exhibiting symptoms of a serious medical need. *Id.* ¶ 62. Yet, on July 22, after his condition had declined for four days straight, they failed to notify a charge nurse, nurse practitioner, or physician of his worsening condition, develop a treatment plan for him, arrange transfer to a hospital or other provider, or take any other reasonable step to improve his health. *Id*. Nurse Gomez diagnosed Mr. Oakie with a "common cold" despite his

sustained fever, hearing loss, and two weeks of escalating symptoms, then provided nothing more than Tylenol, cetirizine, and cough medication. *Id.* ¶¶ 53–56. Hours later, Nurse Ramos observed Mr. Oakie sweating profusely and reporting dizziness, nausea, vomiting, chills, and 8 out of 10 pain in his head and left ear at. *Id.* ¶¶ 58–59. That evening, Nurse Little documented a fever of 99.7°F, a pulse of 112 beats per minute, and dull body aches. *Id.* ¶ 61. Despite these worsening symptoms, none of these nurses escalated Mr. Oakie's care. *Id.* ¶ 62.

***Advanced Registered Nurse Practitioner Cunningham.*** When Mr. Oakie was finally seen by a higher-level provider—an advanced registered nurse practitioner—he still did not receive adequate care. ARNP Cunningham ordered labs on July 23, the first time labs had been ordered for Mr. Oakie despite over a week of escalating symptoms. *Id.* ¶¶ 65–66. The results reflected critical values consistent with a severe, systemic infection: a white blood cell count of 22.3 (severely elevated), neutrophils of 20.3 (critically elevated), glucose of 180 (high), elevated AST and ALT indicating liver stress and inflammation, low hemoglobin, and elevated monocytes and immature granulocytes. *Id.* ¶ 75. Cunningham also noted dark vomit, generalized abdominal discomfort, and continued fever, nausea, and vomiting. *Id.* ¶¶ 76–78. Despite these critical lab values and symptoms, Cunningham did not notify a physician, develop a treatment plan, or facilitate transfer to a hospital. *Id.* ¶ 80.

***Nurses Tyson and Younes.*** For the next two days, Mr. Oakie was monitored by Nurses Tyson and Younes, who watched his condition decline and did nothing. On

July 24, Tyson (the charge nurse) documented a fever of 102.1°F, a wet non-productive cough, and dry heaving, but prescribed only allergy and nausea medication. *Id.* ¶¶ 71–74. That evening, Younes noted decreased hearing in Mr. Oakie's left ear and dizziness with ambulation. *Id.* ¶ 81. On July 25, Tyson documented a fever of 102.9°F—the *fourth consecutive day of significant fever*. *Id.* ¶ 82. Younes documented abdominal tenderness, a non-productive cough, and a fever of 101.2°F. *Id.* ¶ 83. They noted Mr. Oakie's continued fever and worsening symptoms over two days, but neither Tyson nor Younes notified a nurse practitioner or physician, developed a treatment plan, or facilitated a hospital transfer. *Id.* ¶ 84.

At no point did any medical staff member document or investigate the escalating constellation of symptoms as consistent with otomastoiditis progressing to meningitis or take steps to have Mr. Oakie evaluated by a physician or at a hospital. *Id.* ¶ 85. It was evident that Mr. Oakie was suffering a much more severe illness, but the care provided by each of these providers is strikingly similar to that cursory care which the *Ancata* court maligned. Plaintiff has alleged care by multiple providers that was so poor it amounted to none at all. This is sufficient to state a claim of deliberate indifference. The practitioners' motion to dismiss should be denied.

**B. Plaintiff has adequately pled municipal and supervisory liability claims against HOF and Dr. Pearson, respectively.**

Plaintiff has pled sufficient facts to support a claim that HOF and its Chief Healthcare Administrator for Inmate Health, Dr. John Pearson, were aware of an unconstitutional custom of depriving detainees of medical care at MCJ but did

nothing to address it. "A private entity ... is subject to liability under section 1983 when it performs a function traditionally within the exclusive prerogative of the state, such as contracting ... to provide medical services to inmates ..." *Denham v. Corizon Health, Inc.*, 675 F. App'x 935, 940 (11th Cir. 2017). Plaintiff must allege that HOF 1) "undertook the challenged policy, custom, act, or decision … with deliberate indifference to its known or obvious consequences" and 2) there is a "direct causal link between the municipal action and the deprivation of federal rights." *Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025). Likewise, a plaintiff can establish supervisory liability by showing a policy or custom, or the absence thereof, led to a constitutional violation. *Piazza v. Jefferson Cnty., Alabama*, 923 F.3d 947, 957 (11th Cir. 2019). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." *Id.* Plaintiff adequately alleges that HOF's practices culminated in a custom of woefully deficient healthcare throughout the jail.

*i. HOF and Dr. Pearson facilitated inadequate medical care in MCJ.*

HOF was responsible, via its contract with Sheriff Woods, for ensuring constitutionally adequate medical care for all inmates at MCJ. ECF 25 ¶ 126. Dr. Pearson was the Chief Healthcare Administrator for Inmate Health in MCJ via his employment with HOF. ECF 25 ¶ 19. He was a supervisor for HOF with authority to implement policies and practices regarding medical care (*Id.* ¶ 206), as well as recommend terminations of County employees to the Sheriff (*Id.* ¶ 141).

Plaintiff plausibly alleges HOF and Dr. Pearson knowingly permitted widespread practices of keeping detainees with serious medical needs at MCJ when they need to go to the hospital, employing conservative and ineffective treatments, understaffing medical providers, ignoring and trivializing complaints, and delaying responses to medical requests. *Id.* ¶¶ 112-116. These practices, the multiple incidents of dangerous care they caused, and HOF and Dr. Pearson's notice thereof are illustrated in Plaintiff's Complaint primarily through the many grievances of a whistleblower, Mary Coy. In November 2022, she wrote a letter to Sheriff Woods and other supervisors notifying them of these practices within the jail, including that medical care had degraded so severely that inmates were being denied healthcare, referencing "lots of documentations of inmates suffering for hours before horrific things happen to them regarding their medical needs." *Id.* ¶ 133. She stated:

> I am asking that the inmates (Human Beings) be given basic humane treatment as defined by policies/procedures, legal and ethical laws. Yes. I define this as a toxic environment, knowing what I know and fighting against it has put me in a bad position and **I am tired of reading in documentation and hearing from inmates and staff of what is inhumane treatment. I am tired of crying about it and reporting it.** I am asking that these inmates be heard and the concerned staff, so they can receive appropriate treatment as defined by laws and standards.

*Id.* ¶ 134 (emphasis added). Ms. Coy's letter references multiple incidents that are documented and describes the incidence of denying medical treatment as so common that she had become emotional and exhausted by reporting it. Ms. Coy also repeatedly made jail supervisors aware of **multiple** incidents in which sick call requests were not being timely performed (*Id.* ¶ 135), medical staff were practicing

"punitive medicine" (*Id*.), there were lapses in inmate care (*Id.* ¶ 138), the jail was violating Florida Model Jail Standards (*Id.* ¶ 148), and an inmate died because he did not receive adequate medical care while detoxing (*Id.* ¶ 149). These allegations indicate there are multiple incidents and reports of depriving detainees of medical care in MCJ, lending the inference of a widespread practice of such deprivations. **Ms. Coy made Dr. Pearson aware of the lapses in inmate care, like those detailed in her letter, on many occasions.** *Id.* ¶ 138.

Ms. Coy is not the only person who has identified incidents of poor medical care in MCJ. A Facebook video posted by Sheriff Woods in which he commended the medical care inside MCJ received dozens of comments from community members that support the further inference that deprivations of medical care happen at MCJ routinely. One identified the culture of ignoring inmates: "Your medical staff is not professional and they never believe people. Then by the time they and [yo]u do something, the person dies." *Id.* ¶ 157. Another identified an incident that is similar to Mr. Oakie's: "I been in there and firsthand watched a man have a medical emergency and watched your deputies yell at us for 'banging on the glass' to get [their] attention for said emergency." *Id.* Another lamented the multiple deaths within the jail: "One life being saved at intake doesn't count for the lives lost in the jail itself." *Id.* Yet another identified a specific incident of an inmate becoming severely dehydrated because he did not receive adequate medical attention. *Id*. The community has been so vocal about the poor medical care in MCJ that Sheriff

Woods felt the need to address news coverage regarding medical care of inmates at a Board of Commissioners budget workshop: "Regardless of what these articles are being written out here, I don't give a crap what the media is saying. Heart of Florida does a damn good job of providing the services for the inmates." *Id.* ¶ 158. Such outcry about the jail's practices, combined with Ms. Coy's multiple pleas to leadership to improve the care at MCJ, supports an inference that a custom of depriving inmates of medical care persisted there.

Plaintiff further alleges that, despite the widespread persistence of these practices, HOF and Dr. Pearson failed to address them. When Ms. Coy raised concerns about MCJ's medical care on multiple occasions, HOF and Dr. Pearson did nothing to improve it. *Id.* ¶¶ 138-142, 178-181, 204-209. Indeed, healthcare at MCJ has continued to degrade under HOF and Dr. Pearson's watch. *Id.* ¶¶ 108, 123-125. Plaintiff's complaint makes it plausible that HOF and Dr. Pearson facilitated a custom of deficient medical care at MCJ and did nothing to address it.

At the pleadings stage, Plaintiff does not have to *prove* that multiple incidents occurred. Her Complaint need only make it *plausible* that the widespread practices existed. Ms. Coy's advocacy makes it plausible that, by November 2022, there were so many inmates receiving no or poor medical care that she had grown tired of reporting it and becoming emotional over it. Her continued advocacy after that correspondence makes it plausible that punitive medical care continued at MCJ despite her concerns, and incidents continued to occur. This is corroborated by the online statements made by community members, including former detainees, as well

as media coverage of MCJ's medical care. While records of the incidents are within the unique possession of Marion County and HOF and, thus, will become available in discovery, the allegations make it plausible that those incidents did, in fact, occur. Plaintiff has plausibly alleged the widespread deprivation of medical care in MCJ.

*ii. MCJ's practices related to inadequate medical care caused Mr. Oakie's death.*

The constitutional violation that Mr. Oakie experienced—deprivation of medical care—is causally linked to Defendants' widespread practice of depriving detainees of medical care. As discussed, *supra*, Mr. Oakie's constitutional rights were violated by multiple HOF providers, who failed to provide him with access to medical care as his symptoms continued to worsen. There is a direct causal link between MCJ's widespread practice of depriving detainees of medical care and Mr. Oakie's lack of care at the hands of HOF staff.

Nurses Little, Ramos, and Gomez had knowledge that Mr. Oakie had been exhibiting symptoms of a serious medical need since July 18, 2024, yet on July 22, after his condition had continued to decline for four days straight, failed to notify a charge nurse, nurse practitioner, or physician of Mr. Oakie's worsening condition, develop a treatment plan for him, arrange his transfer to a hospital or other emergency medicine provider, or take any other reasonable step to improve his health. ECF 25 ¶ 62. When Mr. Oakie was finally seen by a nurse practitioner, he still did not receive adequate care. Mr. Oakie's lab results had several concerning findings, including liver stress, liver inflammation, low hemoglobin, high glucose, severely elevated white blood cells, and critically elevated neutrophils. *Id.* ¶¶ 75-79.

Cunningham knew of these results *and* Mr. Oakie's symptoms, like his sustained fever, but did not notify a physician, develop a treatment plan, or facilitate his transport to a hospital. *Id.* ¶ 80. For the next two days, Mr. Oakie was monitored by Nurses Younes and Tyson, who continued to watch his condition decline, noted his fever continuing to rage, and did nothing. *Id.* ¶ 82-84. Put simply, Mr. Oakie's providers dismissed his legitimate and serious symptoms as a common cold, and he ultimately died from his infection. Per *Ancata*, such deficient care amounts to no care at all, and constitutes deliberate indifference. That is the precise type of deprivation of care that flows from MCJ's widespread practices, establishing a causal link.

Mr. Oakie's own experience is so linked to the unconstitutional practices at MCJ that it corroborates their very existence. Mr. Oakie died due to the sustained pattern of poor medical care by multiple, independent staff members abiding by the custom of deficient medical care. Indeed, a plaintiff plausibly alleges a "custom" supporting municipal liability where multiple separate medical providers fail to provide medical care in the face of a patently obvious serious medical need. *Howard*, 305 F. Supp. 3d at 1336. MCJ's pattern of poor medical care reached Mr. Oakie at booking, where staff assessed him as underweight, but did not take any steps to address his low BMI. ECF 25 ¶¶ 33-34. A week later, he told staff he was hypoglycemic, did not see a provider until seven days later, and by then his BMI had dropped further. *Id.* ¶¶ 35-36. Then, Mr. Oakie's final week was marked by one failure of medical care after another: nurses independently assessed Mr. Oakie throughout July 22, found Mr. Oakie with a fever and exhibiting concerning

symptoms, but did nothing except order further nurse observation; then ARNP Cunningham read Mr. Oakie's labs to reflect a severe, systemic infection along with other concerning symptoms, but did nothing; then, two nurses independently found Mr. Oakie to have a high fever after *four days* of a sustained fever and other concerning symptoms, but did nothing. There were many opportunities deviate from the custom and provide Mr. Oakie care. Not a single staff member in MCJ did, so Mr. Oakie died from a treatable infection, spending his last week on Earth in agony and distress. The cursory treatment that ultimately killed Mr. Oakie was no accident or anomaly. As Plaintiff has plausibly alleged, it was what MCJ's custom called for.

## CONCLUSION

While in MCJ, Mr. Oakie suffered a serious and sustained illness but received no care to address the underlying cause of his symptoms. This is because HOF practitioners acted with deliberate indifference and did so according to the custom within MCJ of depriving detainees of healthcare—a custom facilitated by HOF and Dr. Pearson. The motion to dismiss (ECF 29) should be denied in its entirety. Alternatively, if the Court identifies deficiencies in Plaintiff's pleading, Plaintiff should be granted leave to amend and cure such deficiencies.

WHEREFORE, Plaintiff respectfully requests this Honorable Court deny Defendants Heart of Florida Health Center, Inc., Pearson, Little, Rutland, Gomez, Ramos, Cunningham, Tyson, and Younes' motion to dismiss.

Respectfully submitted,

*/s/ Sam Harton*
**ROMANUCCI & BLANDIN**
Sam Harton*
321 N. Clark St. STE 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
sharton@rblaw.net
*Pro hac vice

James M. Slater (FBN 111779)
SLATER LEGAL, PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

*Attorneys for Plaintiff*

**Local Rule 3.01 Certification**

Pursuant to Local Rule 3.01, I hereby certify that the above document is limited to twenty pages, exclusive of the case style, signature block and certificates.

By: *_/s/ Sam Harton_*

Sam Harton