UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | |
|---|---|
| MARILYN OAKIE,<br><br>Plaintiff,<br><br>v.<br><br>BILLY WOODS, et al.,<br><br>Defendants. | Case No. 5:26-cv-00405 |

**PLAINTIFF'S RESPONSE TO WOODS, SPIVEY, CUSTODIO, IOVINO, AND GORDON'S MOTION TO DISMISS (ECF 30)**

Now Comes Plaintiff, by and through her attorneys, responding to Defendants Woods, Spivey, Custodio, Iovino, and Gordon's motion to dismiss Plaintiff's Amended Complaint. Plaintiff states as follows:

## INTRODUCTION

Jacob Oakie died of a treatable infection in the Marion County Jail, where an ear infection progressed toward streptococcal meningitis while he ran a sustained fever, vomited, lost hearing in his left ear, and returned lab results showing a severe systemic infection. His providers knew of this serious illness, but no one sent him to a hospital or even had him seen by a physician. Eventually, his illness left him disoriented and unable to follow commands. Though they witnessed his obvious distress, Deputies Custodio, Iovino, and Gordon did not call for medical. Custodio sprayed him with pepper gel instead, and after rinsing him off, the deputies put him back in his cell, where he received no medical attention for two hours. When a nurse finally reached him at 7:41 a.m., she called 9-1-1. Mr. Oakie died two days later.

Mr. Oakie's death was the predictable result of how Sheriff Woods and Captain Spivey ran the jail. Plaintiff alleges a cost-driven custom of keeping sick detainees out of the hospital, ignoring and delaying medical requests, and tolerating chronic understaffing. Woods and Spivey's own Medical Services Liaison, Mary Coy, warned them repeatedly of the custom of medical care deprivations in the jail, but they fired her rather than act. The public raised the same alarm, but Woods dismissed it, too, and continued to contract with a medical provider he knew was delivering inadequate care. Defendants' motion asks the Court to look past these

allegations. It relies on medical records outside the pleadings, draws inferences in Defendants' own favor, and recasts a claim of denied care as a dispute over medical judgment. None of those arguments survives Rule 12(b)(6). The Amended Complaint plausibly pleads an unconstitutional custom supporting supervisory and municipal liability, violations of clearly established law by the deputies, and state law claims against the Sheriff. The motion should be denied.

## FACTUAL BACKGROUND

When Jacob Oakie was booked into the Marion County Jail on June 20, 2024, he was severely underweight with a BMI of 16.1. ECF 25 ¶ 33. On June 27, 2024, Mr. Oakie submitted an Inmate Medical Request Form stating he was hypoglycemic and losing weight, but was not seen until July 4, 2024, 7 days later, at which point his BMI had decreased to 15.5. *Id.* ¶¶ 35-36. MCJ medical staff ordered weekly weight checks, a tuberculin skin test, and a 3,000-calorie diet for Mr. Oakie. *Id.* ¶¶ 37-40. Mr. Oakie was not seen by medical staff again until July 19, 2024. *Id.* ¶ 41.

### A. Mr. Oakie died because, while at the MCJ, he did not receive medical care for his obviously serious symptoms of meningitis.

On July 18, 2024, Mr. Oakie submitted another medical request documenting a "really bad" and painful ear infection. *Id.* ¶ 42. On July 19, 2024, Nurse Rutland evaluated him. Mr. Oakie reported that his left ear was swollen, painful, and intermittently draining, that he had a cold, his jaw was painful, and his pain level was at an 8 out of 10. *Id.* ¶ 44. His BMI had also dropped to 14.9. Id. ¶ 45. Finding nothing in the ear itself to explain Mr. Oakie's symptoms, Rutland ordered no

additional tests, did not contact a physician to evaluate Mr. Oakie, prescribed ibuprofen and mucus relief, and told him to return in three days if condition worsened. *Id.* ¶¶ 46-47. Mr. Oakie returned to Rutland on July 20, 2024, reporting increased ear pain, after which she contacted the charge nurse, Nurse Tyson, and referred him to the infirmary. *Id.* ¶¶ 48-49. Nurse Mbayo Umba also found nothing in the ear itself to explain the symptoms but took no further action except instructing him to continue with pain medications. *Id.* ¶ 50. On July 21, 2024, Mr. Oakie reported his ear pain to his mother and that he had not been given any medications. *Id.* ¶ 51. No medical staff assessed or treated him on that day. *Id.* ¶ 52.

On July 22, 2024, at 11:04 a.m., Mr. Oakie was seen by Nurse Sandy Gomez, where he complained of being unable to hear out of his left ear, with head pressure and a cough lasting two weeks. *Id.* ¶ 53. Mr. Oakie had a fever of 99.1°F and weighed 103 pounds with a BMI of 14.8. *Id.* ¶¶ 54-55. Nurse Gomez diagnosed Mr. Oakie with a "common cold," gave him Tylenol, cetirizine, continued NSAIDs, cough medication, and instructed him to increase water intake. *Id.* ¶ 56. At 4:10 p.m., Mr. Oakie reported to Nurse Dorisvel Ramos that he was experiencing dizziness, nausea, vomiting, chills, cough, earache, a sharp pain in his head and left ear, and a pain rating of 8 out of 10. *Id.* ¶¶ 57-58. Ramos observed him sweating profusely. *Id.* ¶¶ 59-60. At 7:28 p.m. that night, Nurse John Little documented that Mr. Oakie had a fever of 99.7°F, pulse of 112 beats per minute (high), dull body aches, and a pain rating of 6 out of 10. *Id.* ¶ 61. On July 22, Nurses Little, Ramos, and Gomez knew Mr. Oakie had been very sick for four days without improvement,

but they did not notify a charge nurse, nurse practitioner, or physician, develop a treatment plan, or facilitate transfer to an outside medical provider. Id. ¶ 62

On July 23, 2024, Mr. Oakie refused his breakfast tray in the early morning and Nurse Fraser documented vomiting and a fever of 101.8°F. *Id.* ¶¶ 63-64, 66. Following an evaluation of Mr. Oakie, ARNP Duane Cunningham ordered labs, including complete metabolic panel (CMP), complete blood count (CBC) with differential, and blood cultures, the first diagnostic studies ordered for Mr. Oakie's illness. *Id.* ¶¶ 65-66. Later that night, Cunningham documented his worsening symptoms of fever, cough, left ear pain, weakness, nausea and vomiting, then ordered IV fluids, chest X-ray, and non-prescription medications. *Id.* ¶¶ 67-68. The X-ray showed no acute findings, but no other tests were ordered. *Id.* ¶ 69. The lab results came in on July 23, 2024; Cunningham reviewed them the next day. *Id.* ¶ 70.

On July 24, 2024, at 9:01 a.m., Nurse Tyson documented Mr. Oakie's 102.1°F fever, a wet, non-productive cough and dry heaving. *Id.* ¶¶ 71-72. Tyson ordered a hepatitis panel and prescribed allergy and nausea medication. *Id.* ¶ 73. Cunningham reviewed the lab results, which had several concerning findings, including liver stress and inflammation, low hemoglobin, high glucose, severely elevated white blood cells, and critically elevated neutrophils. *Id.* ¶ 75. Cunningham noted symptoms signaling severe systemic infection, including dark vomit, abdominal discomfort, continued fever, nausea, and inability to drink water. *Id.* ¶¶ 75-79. Cunningham did not notify a physician of these worsening symptoms, develop a treatment plan, or

facilitate his transport to a hospital. *Id.* ¶ 80. Nurse Younes also saw Mr. Oakie that night and noted decreased hearing in Mr. Oakie's left ear and dizziness but did not take any steps to address Mr. Oakie's deteriorating health. *Id.* ¶ 81.

On July 25, 2024, Nurse Tyson took Mr. Oakie's temperature twice, finding a fever of 102.9 and 100.4°F. *Id.* ¶ 82. Nurse Younes took his temperature again that night and found a fever of 101.2°F. *Id.* ¶ 83. Younes also noted abdominal tenderness, non-productive cough, negative blood cultures, and Mr. Oakie spitting into the toilet. *Id*. Despite a *fourth day* of significant fever and other worsening symptoms, Tyson and Younes did not notify a nurse practitioner or physician, did not develop a treatment plan, and did not facilitate transfer to a hospital. *Id.* ¶ 84. Mr. Oakie was seen independently by multiple nurses and one nurse practitioner between July 19 and July 25, but not a single one investigated the escalating constellation of symptoms—ear pain, jaw swelling, fever, hearing loss, high WBC, vomiting, dizziness, and neurological changes—as consistent with otomastoiditis progressing to meningitis, nor did transfer Mr. Oakie to a hospital. *Id.* ¶ 85.

On July 26, 2024, Mr. Oakie's symptoms continued, and he began to exhibit an altered mental state. *Id.* ¶ 86. Around 2 a.m., he refused his IV and began to yell and hit the glass of his cell, continuing this behavior for several hours. *Id.* ¶ 87. Finally, deputies came to his cell, but they were not there to help him get the medical attention he needed. *Id.* ¶ 88. Deputy Custodio almost immediately ordered him into restraints, which Mr. Oakie could not comply with due to his medical distress and

altered mental state, prompting Custodio to spray him with pepper gel. *Id.* ¶¶ 88-90. Custodio and his fellow deputies, Iovino and Gordon, did not call medical at any time, even after spraying Mr. Oakie with a chemical agent. *Id.* ¶¶ 91, 93. All they did was wash him off in the shower, then place him back in his cell. *Id.* ¶ 92.

Nurse Ramos finally arrived at his cell at 7:41 a.m. and called 9-1-1. *Id.* ¶ 94. Mr. Oakie was diagnosed with meningitis shortly after arriving at the hospital and entered respiratory distress during an MRI. *Id.* ¶¶ 96-100. He died on July 28, 2024, of respiratory failure with hypoxia caused by streptococcal meningitis. *Id.* ¶ 103.

### B. Sheriff Woods and Captain Spivey allow MCJ to operate according to unconstitutional policies and practices regarding detainee healthcare.

Mr. Oakie's lack of medical care was not an anomaly. There is a custom in MCJ of providing poor medical care, largely as a cost-cutting measure. Marion County is responsible for paying medical expenses associated with outside provider treatment of a detainee. *Id.* ¶ 109. Accordingly, Sheriff Woods discourages MCJ staff from referring detainees out, even when medically necessary, to save money. *Id.* ¶¶ 109-111. But no matter the cost, Sheriff Woods is responsible for ensuring MCJ provides constitutionally adequate medical care, and he delegates that non-delegable responsibility to Heart of Florida Health Center (HOF). *Id.* ¶¶ 120-21, 127.

MCJ's widespread practices result in ubiquitously poor healthcare throughout the jail. Staff fail to refer detainees suffering from a serious medical condition to a hospital or specialist even when they know that their condition requires treatment beyond the jail's capabilities. *Id.* ¶ 112. Staff routinely employ conservative treatment

of serious medical needs to avoid having to send someone to a higher level of care, which is more likely to be expensive. *Id.* ¶ 113. MCJ is chronically understaffed, so there are not enough medical providers to provide adequate care. *Id.* ¶ 114. Medical complaints at the MCJ are ignored and trivialized, leading to deprivation of care, delays in care, and detainees receiving conservative treatment for serious needs. *Id.* ¶ 115. Sheriff Woods also maintains a widespread practice of delaying responses to medical requests by inmates, in which inmates could be made to wait an entire week to receive attention from medical staff, as Mr. Oakie was. *Id.* ¶¶ 33-41, 116.

Since contracting with HOF, MCJ has frequently suffered medical staffing shortages and failed to meet Florida jail model standards for timely handling of inmate complaints. *Id.* ¶ 123. Approximately four people die in MCJ each year, which is about four times the national average jail death rate. *Id*. ¶ 107. Reports indicate significant noncompliance with jail medical standards, reflecting generally poor practices relating to inmate care. *Id.* ¶ 108. Post-booking hospital visits in 2023 and 2024 dropped to less than half of historic levels, which is consistent with Woods' and HOF's custom of depriving detainees of necessary transfers to the hospital to save money. *Id.* ¶ 125. Staffing gaps have often left only one registered nurse responsible for both infirmary monitoring and intake assessments at MCJ. *Id.* ¶ 124.

Sheriff Woods and Captain Brian Spivey were informed on many occasions that staff were depriving inmates of necessary healthcare pursuant to an unconstitutional custom. *Id.* ¶ 128. Mary Coy, a registered nurse with approximately 35 years of experience, was a Medical Services Liaison at MCJ responsible for

auditing medical conditions in the jail. *Id.* ¶¶ 129-30. In November 2022, Ms. Coy wrote a letter to MCJ supervisors Captain Spivey and Sheriff Woods that placed Woods, Spivey, and other MCJ supervisors on notice of the poor medical care facilitated by HOF in the jail. *Id.* ¶¶ 132-33. In her letter, Ms. Coy detailed many detainees complaining of the care they received in the jail, and at least one detainee with asthma and COPD being denied breathing treatments and access to medical care until he entered significant respiratory distress. *Id*. Ms. Coy noted "lots of documentations of inmates suffering for hours before horrific things happen to them regarding their medical needs." *Id*. Ms. Coy ended her letter with the following:

> I am asking that the inmates (Human Beings) be given basic humane treatment as defined by policies/procedures, legal and ethical laws. Yes. I define this as a toxic environment, knowing what I know and fighting against it has put me in a bad position and I am tired of reading in documentation and hearing from inmates and staff of what is inhumane treatment. I am tired of crying about it and reporting it. I am asking that these inmates be heard and the concerned staff, so they can receive appropriate treatment as defined by laws and standards.

*Id*. ¶ 134. When Sheriff Woods and Captain Spivey received that letter, they became personally aware of the poor medical treatment in the jail, including HOF's practices of "punitive medicine" and denying basic medical care to detainees at MCJ. *Id.* ¶ 135. On December 14, 2023, Ms. Coy submitted a report to her MCJ supervisors that reflected severe noncompliance with Florida Model Jail Standards that concerned detainees' receipt of medications. *Id.* ¶ 148. Additionally, Ms. Coy told her supervisors she observed a detoxing inmate who endured hours of pain as nurses refused to treat him, ultimately leading to his death. *Id.* ¶ 149.

Beyond the November 2022 letter, Ms. Coy made several more complaints to MCJ supervisors about the problems with medical care at MCJ. *Id.* ¶¶ 138-49. She was instructed by her supervisors several times to refrain from personal opinions related to inmate health diagnosis and treatment, and Woods and Spivey were aware that she had been so instructed. *Id.* ¶ 143. Woods and Spivey took no reasonable steps to address Ms. Coy's concerns, thereby allowing inhumane treatment of inmates to continue. *Id.* ¶¶ 136-137. Rather than address Ms. Coy's repeated concerns regarding deficiencies in medical care, they complied with an HOF supervisor's plea to Captain Spivey to fire her. *Id.* ¶¶ 139, 150-151. Since her termination, MCJ has not filled her position and no longer employs anyone whose responsibility it is to track MCJ or HOF's compliance with jail standards. *Id.* ¶ 152.

Sheriff Woods and Captain Spivey ignored the continued problems of inadequate healthcare in MCJ and even mocked those who published their criticisms. *Id.* ¶ 155. Community members, former detainees, and former employees of Marion County Sheriff's Office (MCSO) have raised concerns about the inadequate healthcare in MCJ and Sheriff Woods is personally aware of the community's concerns. *Id.* ¶¶ 117-118, 155-58. Defendant Woods posted a video on Facebook in which he commended his staff who "do a great job day in and day out." *Id.* ¶ 156. Many community members disagreed and expressed their views that the medical care in the jail is dangerously poor in dozens of comments posted on the video, including the following:

> "Your medical staff is not professional and they never believe people. Then by the time they and [yo]u do something, the person dies."
>
> "I been in there and firsthand watched a man have a medical emergency and watched your deputies yell at us for 'banging on the glass' to get [their] attention for said emergency."
>
> "One life being saved at intake doesn't count for the lives lost in the jail itself"
>
> "You are so full of crap sheriff Woods I have been in your jail and I have seen how some of the medical staff and your detention deputies treat inmates for instance I was in your jail from October of 2023 to December of 2023 when I was released and there was a inmate in the pod I was in that was detoxing and was trying to get medical help because he was throwing up and couldn't keep food down and guess what he was told by the pod officer and these was the exact words "deal with it" it got to the point where myself and other inmates told him to complain of chest pain which he did and wouldn't you know he was kept in medical for 3 days because he was dehydrated so DO NOT SIT THERE AND SAY INMATES IN YOUR JAIL ARE TREATED PROPERLY YOU ARE A SINCERE DISGRACE TO THE BADGE because you cover up corruption in your department"

*Id.* ¶ 157 (sic). Woods told the Marion County Board of Commissioners during a budget workshop that HOF provided good care for the inmates: "Regardless of what these articles are being written out here, I don't give a crap what the media is saying. Heart of Florida does a damn good job of providing the services for the inmates." *Id.* ¶ 158. Woods' claims about the sufficiency of care at MCJ show a dismissive attitude toward the issue. *Id.* ¶ 159. Inmates are routinely denied medical care because of the deliberate indifference by Woods, Spivey, other supervisors, and HOF. *Id.*

## STANDARD OF REVIEW

Under Rule 12(b)(6), a complaint must provide "more than . . . a formulaic recitation of the elements of a cause of action," but it "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). The Court must accept all well-pleaded facts as true, drawing all reasonable inferences in Plaintiff's favor. *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1534 (11th Cir. 1994). So construed, the complaint need only contain "enough facts to state a claim to relief that is plausible on its face." *Brooks v. Warden*, 800 F.3d 1295, 1300 (11th Cir. 2015) (quotation omitted). This "is not akin to a 'probability requirement'"; the plaintiff need only allege "'enough fact to raise a reasonable expectation that discovery will reveal evidence' of the claim." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556).

## ARGUMENT

### A. The Court cannot consider Mr. Oakie's medical file in assessing the sufficiency of her Complaint.

Citing no authority, County Defendants claim that the Amended Complaint incorporates Mr. Oakie's medical records such that they can be appropriately considered on a motion to dismiss. ECF 30 at 6-7. A court may consider a document attached to a motion to dismiss without converting it to a motion for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed—"that the authenticity of the document is not challenged." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). A document is not "central" to a plaintiff's complaint just because it contains relevant information or facts. *See*

*Adamson v. Poorter*, No. 06-15941, 2007 WL 2900576, at *3 (11th Cir. Oct. 4, 2007) (unpublished[1]) (holding the district court erred in dismissing a prisoner's complaint because it relied on defendant declarations filed with their motion to dismiss).

In *Cineus v. Fla. Dep't of Corr.*, No. 8:21-CV-1659-MSS-SPF, 2022 WL 4448599 (M.D. Fla. Sept. 23, 2022), Judge Scriven determined that defendants could not submit medical records in a deliberate indifference case at the dismissal stage without converting the motion to a motion for summary judgment because it would be premature to do so when the parties had not undertaken discovery. *Id.* There, the plaintiff had referred to medical records to identify and substantiate treatment but did "not otherwise quote or rely on the medical records *to support the deliberate indifference claim against Centurion*." *Id.* (emphasis supplied). The court found the medical records were not "central" to the claim because the plaintiff could present witness testimony, rather than introducing medical records, to prove the claims. *See id.* (citing *Finan. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284–85 (11th Cir. 2007) ("[T]he First Circuit has held, with respect to a complaint alleging libel and other related claims, that a magazine article referred to in the complaint and attached to the defendant's motion to dismiss was central to the plaintiffs' claim because '[p]laintiffs unquestionably would have had to offer a copy of the article in order to prove their case,'" quoting *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1015 (1st Cir. 1988)).

---

[1] Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority. *See* Fed. R. App. P. 32.1; 11th Cir. R. 36–2; *McNamara v. GEICO*, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

Although Plaintiff never directly references or quotes Mr. Oakie's medical records, they do contain relevant information that is reflected in her Amended Complaint. That is not sufficient, though, to meet the centrality requirement for Plaintiff's claims against Defendants. Indeed, those documents may ultimately be unnecessary to support Plaintiff's claims of deliberate indifference or municipal and supervisory liability. Plaintiff alleges that the officers who interacted with Mr. Oakie saw that he was in medical distress, did not call for medical attention, and one of the officers even responded by spraying him with toxic chemicals. ECF 25 ¶¶ 86-93, 168. Discovery undoubtedly will yield incident reports, testimony of staff, treaters, and other detainees, surveillance video, and other records that evidence defendants' knowledge of Mr. Oakie's medical need and subsequent response. Regarding Plaintiff's allegations against the Sheriff and Captain, Plaintiff will receive testimony from staff and supervisors, policies, post orders, evidence of prior similar incidents, statements by the Sheriff, and the like. Medical records are likely to play a minimal role in Plaintiff's ability to prove her case against the Sheriff, Captain and their officers, and are certainly not *required* to demonstrate an unconstitutional custom. As in *Cineus,* they are not "central" to the claims and cannot be considered at this stage.

**B. Deputies Custodio, Gordon, and Iovino were deliberately indifferent to Oakie's serious medical need and violated clearly established law.**

Custodio, Gordon, and Iovino state that Plaintiff cannot establish deliberate indifference because her Complaint simply "attack[s] the medical judgment surrounding Oakie's treatment." ECF 30 at 19. But Plaintiff complains of these

defendants' failure to provide him with *any* medical care, or access thereto; she does not take issue with their medical judgment. To establish liability on a deliberate indifference claim, a plaintiff must satisfy an objective and a subjective element. The plaintiff must first "demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024). Second, the plaintiff must demonstrate that the defendant exhibited "subjective recklessness as used in the criminal law," which means they "actually knew that his conduct—his own acts or omissions—put the plaintiff at substantial risk of serious harm" from that medical condition. *Id.* (quotations omitted).

A serious medical need "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Howard v. Wilkinson*, 305 F. Supp. 3d 1327, 1335 (M.D. Fla. 2018) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). Mr. Oakie's medical need was objectively serious, as he had contracted a bacterial infection, which was ultimately deadly, that caused him to exhibit distressing symptoms for over a week, sustain a fever for several days, and return lab results reflecting a serious infection. ECF 25 ¶¶ 75, 84-85, 98, 104. Defendants claim that Mr. Oakie's medical need did not become serious until he was septic at 7:41 a.m. on the day he was finally taken to the hospital, but that is not what Plaintiff alleges. See ECF 25 ¶¶ 80, 84, 165-169. By the time the deputies interacted with him, Mr. Oakie was very ill: his symptoms had escalated, and he was unable to comply with orders due to an altered mental state. ECF 25 ¶¶ 86-93.

The deputies knew that Mr. Oakie was very ill. Mr. Oakie was in the infirmary, refusing an IV, and was exhibiting signs of obvious distress and an altered mental state. *Id.* ¶¶ 86-93. Then, after Deputy Custodio sprayed Mr. Oakie with pepper gel, they knew the situation was even more serious—this detainee who was already very ill had now encountered a harmful chemical. *Id.* Reasonable inferences can be drawn that these deputies, at both stages of interaction, understood Mr. Oakie required medical attention. Yet, they failed to address Mr. Oakie's medical needs. Custodio not only failed to call for medical attention when he noticed Mr. Oakie in distress but made matters worse by spraying him with a chemical agent, even though he was "in a state of severe distress and mental alteration that prevented him from understanding and/or complying with orders." ECF 25 ¶¶ 86-93, 168. Iovino and Gordon did not seek a medical evaluation prior to Custodio spraying Mr. Oakie, either, even though they witnessed the same distress. *Id.* at ¶ 93. Then, Custodio, Iovino, and Gordon "fail[ed] to seek immediate medical attention for Jacob Oakie after using chemical agents on a critically ill patient." *Id.* ¶ 168. Mr. Oakie was sprayed by Custodio shortly after 5 a.m., then did not receive any medical attention until 7:41 a.m., meaning he received no medical evaluation for his symptoms causing the original distress or the pepper spray for over two hours. *Id.* ¶¶ 86-94. When a nurse finally came, she determined Mr. Oakie needed to go to the hospital and called 9-1-1. He received *no* medical attention for two hours while in visible distress because of their actions. Plaintiff has sufficiently pleaded deliberate indifference.

The deputies are also not entitled to qualified immunity because Mr. Oakie's right to medical care was clearly established. "For more than twenty years it has been 'clearly established that knowledge of the need for medical care and intentional refusal to provide that care constitute[s] deliberate indifference.'" *McCarley v. Dunn*, 722 F. Supp. 3d 1242, 1265 (N.D. Ala. 2024) (citing *Harris v. Coweta Cnty.*, 21 F.3d 388, 393 (11th Cir. 1994)). "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Id*. (citing *Patel v. Lanier Cnty.*, 969 F.3d 1173 (11th Cir. 2020)).

Plaintiff alleges that, prior to Custodio spraying Mr. Oakie, each of the defendant officers knew that Mr. Oakie had a history of escalating illness, was in an altered mental state, and was in the infirmary (indicating underlying medical issues). ECF 25 ¶ 93. Yet, they all failed to seek medical attention for him, even after Custodio had taken steps to make Mr. Oakie's situation more painful and dangerous. Id. ¶ 168. It is clearly established that when an officer knows that a prisoner has a serious medical need, they must do *something* to address it. These deputies did not.

Defendants claim that, prior to pepper spraying him, Mr. Oakie "outwardly displayed only clear, coherent behavior consistent with a belligerent jail inmate that was not getting what he wanted." ECF 30 at 18. But their motion recognizes Plaintiff's actual allegations: Mr. Oakie refused to submit to hand restraints because "in his altered mental state, Oakie did not understand or comply with the orders." ECF 30 at 12 (citing ECF 25, Plaintiff's Complaint ¶ 89). In any event, the Court

must draw inferences in Plaintiff's favor. Defendants have injected their own inferences that Mr. Oakie's "silent treatment" and subsequent yelling and kicking on the door support his coherence, thus justifying the use of pepper spray. Plaintiff pleads the opposite: Custodio did not call for medical attention when Mr. Oakie's behavior was obviously indicative of severe distress and disorientation but chose to put him in further distress by spraying him with a chemical agent. ECF 25 ¶ 89.

### C. Plaintiff has adequately pleaded municipal and supervisory liability claims against Sheriff Woods and Captain Spivey.

Plaintiff's municipal and supervisory liability claims against Sheriff Woods[2] and Captain Spivey are not premised on *respondeat superior*; they are premised on the implementation of policies that Woods and Spivey knew posed a risk to detainees but failed to address. To establish municipal liability, Plaintiff must allege 1) "the municipality undertook the challenged policy, custom, act, or decision … with deliberate indifference to its known or obvious consequences" and 2) there is a "direct causal link between the municipal action and the deprivation of federal rights." *Smothers v. Childers*, 159 F.4th 922, 931 (11th Cir. 2025). Likewise, a plaintiff can establish supervisory liability by showing a policy or custom, or the absence thereof, led to a constitutional violation. *Piazza v. Jefferson Cnty.*, 923 F.3d 947, 957 (11th Cir. 2019). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. *Goebert v. Lee Cnty.*,

---

[2] An official capacity suit against an individual is the equivalent of a suit against their office. *Barnett v. MacArthur*, 956 F.3d 1291, 1296 (11th Cir. 2020). Sheriff Woods is sued in his individual capacity (supervisor liability) and official capacity (municipal liability).

510 F.3d 1312, 1332 (11th Cir. 2007). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." *Id.* Plaintiff alleges widespread customs that culminate in woefully deficient healthcare throughout the jail. These policies are largely driven by the Sheriff's delegation of his duty to provide medical care to HOF. Contracting with a private entity does not absolve a municipality of liability, as the duty to provide medical care is non-delegable. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). A county will remain liable for the constitutional deprivations caused by the customs of its medical contractor. *Id*. Here, Mr. Oakie was deprived of medical care at MCJ by both MCJ and HOF staff, consistent with the widespread practice of depriving detainees of healthcare in MCJ to save money, and the Sheriff's decision to continue contracting with a provider it knows provides inadequate healthcare.

*i. Woods and Spivey were deliberately indifferent to the known consequences of providing inadequate medical care in MCJ.*

Plaintiff alleges that Sheriff Woods and Captain Spivey perpetuated a custom of providing deficient medical care at MCJ. When detainees require medical care from an outside hospital, it costs Marion County money, so staff are discouraged from referring people to the hospital, even when medically necessary, to keep costs low. ECF 25 ¶¶ 109-10. This results in a practice of keeping detainees with serious medical needs at MCJ when they need to go to the hospital, employing conservative and ineffective treatments, understaffing medical providers, ignoring and trivializing complaints, and delaying responses to medical requests. *Id.* ¶¶ 112-116.

These widespread practices, the multiple incidents they have caused, and the defendants' notice thereof are illustrated in Plaintiff's Amended Complaint primarily through the many grievances of a whistleblower, Mary Coy. In November 2022, she wrote a letter to Sheriff Woods, Captain Spivey, and other supervisors notifying them of concerning practices within the jail, including that medical care had degraded so severely that inmates were being denied healthcare, referencing "lots of documentations of inmates suffering for hours before horrific things happen to them regarding their medical needs." *Id.* ¶ 133. That letter stated:

> I am asking that the inmates (Human Beings) be given basic humane treatment as defined by policies/procedures, legal and ethical laws. Yes. I define this as a toxic environment, knowing what I know and fighting against it has put me in a bad position and **I am tired of reading in documentation and hearing from inmates and staff of what is inhumane treatment. I am tired of crying about it and reporting it.** I am asking that these inmates be heard and the concerned staff, so they can receive appropriate treatment as defined by laws and standards.

Id. ¶ 134 (emphasis added). Ms. Coy's letter references multiple incidents that are documented and describes the incidence of denying medical treatment as so common that she had been emotional and exhausted by reporting it. Ms. Coy also repeatedly made jail supervisors, including Sheriff Woods and Captain Spivey, aware of **multiple** incidents in which sick call requests were not being timely performed (*Id.* ¶ 135), medical staff were practicing "punitive medicine" (*Id.*), there were lapses in inmate care (*Id.* ¶ 138), the jail was violating Florida Model Jail Standards (*Id.* ¶ 148), and an inmate died because he did not receive adequate medical care while detoxing (*Id.* ¶ 149). These allegations indicate there are multiple incidents and

reports of depriving detainees of medical care in MCJ, lending the inference of a widespread practice of such deprivations.

Ms. Coy is not the only person who has identified incidents of poor medical care in MCJ. A Facebook video posted by Sheriff Woods in which he commended the medical care inside MCJ received dozens of comments from community members that support the further inference that deprivations of medical care happen at MCJ routinely. One identified the culture of ignoring inmates: "Your medical staff is not professional and they never believe people. Then by the time they and [yo]u do something, the person dies." *Id.* ¶ 157. Another identified an incident similar to Mr. Oakie's: "I been in there and firsthand watched a man have a medical emergency and watched your deputies yell at us for 'banging on the glass' to get [their] attention for said emergency." *Id.* Another lamented the multiple deaths at MCJ: "One life being saved at intake doesn't count for the lives lost in the jail itself." *Id.* Yet another identified a specific incident of an inmate becoming severely dehydrated because he did not receive adequate medical attention:

> You are so full of crap sheriff Woods I have been in your jail and I have seen how some of the medical staff and your detention deputies treat inmates for instance I was in your jail from October of 2023 to December of 2023 when I was released and there was a inmate in the pod I was in that was detoxing and was trying to get medical help because he was throwing up and couldn't keep food down and guess what he was told by the pod officer and these was the exact words "deal with it" it got to the point where myself and other inmates told him to complain of chest pain which he did and wouldn't you know he was kept in medical for 3 days because he was dehydrated so DO NOT SIT THERE AND SAY INMATES IN YOUR JAIL ARE TREATED PROPERLY YOU ARE A

> SINCERE DISGRACE TO THE BADGE because you cover up corruption in your department.

*Id.* (sic). Sheriff Woods himself is acutely aware of the community's concerns, as he addressed the news coverage regarding medical care of inmates at a Board of Commissioners budget workshop: "Regardless of what these articles are being written out here, I don't give a crap what the media is saying. Heart of Florida does a damn good job of providing the services for the inmates." *Id.* ¶ 158. This statement provides the plausible inference that Sheriff Woods recognized allegations of poor medical care in the jail *and* confirmed he had no intention of investigating it.

At the pleadings stage, Plaintiff does not have to *prove* that multiple incidents occurred. Her Complaint need only make it *plausible* that an unconstitutional widespread practice existed. Ms. Coy's advocacy makes it plausible that, by November 2022, there were so many inmates receiving no or poor medical care that she had grown tired of reporting it and becoming emotional over it. Her continued advocacy after that correspondence makes it plausible that MCJ staff continued their punitive medical care despite her concerns, and incidents continued to occur. This is corroborated by the online statements made by community members, including former detainees, as well as media coverage of MCJ's medical care, which were summarily dismissed by Sheriff Woods. While records of those incidents are within the unique possession of Marion County and HOF and, thus, will become available in discovery, Plaintiff's allegations make it plausible that those many incidents did, in fact, occur, supporting a widespread practice. Finally, Ms. Coy's consequent

termination supports an inference that Defendants wished to eliminate interference with their unconstitutional practice. Indeed, they have not replaced her, meaning there is no one at MCJ to fill the role of auditing the detainee healthcare. Plaintiff has plausibly alleged that Woods and Spivey knew of the routine, widespread deprivation of medical care in MCJ, yet allowed the poor care to continue.

*ii. Sheriff Woods was deliberately indifferent by continuing to contract with a medical provider known to provide inadequate care.*

Plaintiff further alleges these unconstitutional practices are driven by the decision to continue contracting with HOF. Sheriff Woods maintained a $14 million annual contract with HOF to provide healthcare to detainees at MCJ. ECF 25 ¶¶ 120, 123, 126-27. Since contracting with HOF, the jail has experienced staffing shortages and failed to meet Florida jail standards regarding timely handling of inmate complaints. *Id.* ¶ 123. People die in MCJ at about four times the national average jail death rate. *Id.* at ¶ 107. MCJ has been found noncompliant with medical standards multiple times. *Id.* at ¶¶ 108, 122. Post-booking hospital visits at MCJ dropped to less than half of historic levels in 2023 and 2024. Id. ¶ 125. Staffing gaps have left only one registered nurse responsible for both infirmary monitoring and intake assessments at MCJ. *Id.* ¶ 124. Ms. Coy's role at MCJ was to audit HOF's compliance with state jail standards, and she was terminated due to her many complaints of poor medical care, detailed above, which included complaints against HOF practitioners at MCJ. Id. ¶¶ 130-133, 151.

Sheriff Woods' decision to continue contracting with HOF under these circumstances is, in and of itself, an "official policy that could plausibly have caused the constitutional violation at issue." *Smothers*, 159 F.4th at 932. In *Smothers*, the court found that where a medical contractor is known to provide "persistent poor quality (and lack) of medical care," the decision to continue contracting with them "was an official policy to knowingly provide inadequate medical care to the people in the Jail." *Id*. at 932-33. In reversing summary judgment, the court concluded plaintiff had gathered "enough evidence for a reasonable jury to conclude that [the county] had a policy of contracting with [the medical contractor] to provide the Jail's exclusive medical care, even though the county knew [the medical contractor] was incompetent and offered inadequate care." *Id*. at 932.

Unlike the plaintiff in *Smothers*, Ms. Oakie is not required to present evidence at this stage. But *Smothers* delineates a story that is strikingly similar to Plaintiff's—a municipality knows its jail is providing poor medical care, knows that medical care is being driven by the practices of its medical provider, yet continues to contract with that provider anyway. Plaintiff has pled allegations that make this story plausible, and *Smothers* provides that such decisions are sufficient to support municipal liability.

*iii. MCJ's custom of depriving detainees of medical care caused Mr. Oakie's death.*

The constitutional violation that Mr. Oakie experienced—deprivation of medical care—is sufficiently causally linked to Defendants' custom of depriving detainees of medical care. As discussed, *supra*, Mr. Oakie's constitutional rights were violated by Deputies Custodio, Iovino, and Gordon, who failed to provide him with

access to medical care when he was obviously in distress. Prior to that incident, Mr. Oakie was also denied adequate medical care by MCJ's medical providers who had been delegated the authority within MCJ to provide medical care. There is a direct causal link between MCJ's widespread practice of depriving detainees of medical care and Mr. Oakie's lack of care at the hands of the deputies and HOF staff.

When the "medical care provided was so cursory as to amount to no treatment at all," it can constitute deliberate indifference. *Ancata,* 769 F.2d at 704. In *Ancata*, the prisoner complained of serious symptoms—ankle swelling, inability to sleep, chills, lower back pain, tingling and numbness of his hands, hyperventilation, severe pain, and double vision—but the jail's medical providers did nothing but provide him with non-prescription medication. That was sufficient to state a deliberate indifference claim, and the Eleventh Circuit reversed dismissal. *Id.*

The *Ancata* court also quoted a Third Circuit case, *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978), to demonstrate this type of "cursory" treatment:

> Although the plaintiff has been provided with aspirin, this may not constitute adequate medical care. If, "deliberate indifference caused an easier and less efficacious treatment" to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care.

*Id*. In *West*, the prisoner received aspirin to treat his reports of leg pain after an operation. *West*, 571 F.2d at 162. This created a plausible inference of inadequate care, and the court reversed dismissal. *Id.*

Like the plaintiffs in *Ancata* and *West*, Mr. Oakie complained of and demonstrated serious symptoms—dizziness, sharp pain in his head and left ear, dry

heaving, inability to drink water, elevated heart rate, weakness, cough, vomiting (sometimes dark), high fever, weight loss—and his lab results reflected signs of a systemic infection. Yet, he was not referred to a physician and only received non-prescription medication and fluids. Nurses Little, Ramos, and Gomez had knowledge that Mr. Oakie had been exhibiting symptoms of a serious medical need since July 18, yet on July 22, after his condition had declined for four days, failed to notify a higher-level practitioner, develop a treatment plan, arrange his transfer to a hospital, or take any other reasonable step to improve his health. ECF 25 ¶ 62.

When Mr. Oakie was finally seen by a nurse practitioner, Duane cunningham, he still did not receive adequate care. Mr. Oakie's lab results had several concerning findings, including liver stress and inflammation, low hemoglobin, high glucose, severely elevated white blood cells, and critically elevated neutrophils. *Id.* ¶¶ 75-79. Cunningham knew of these results *and* Mr. Oakie's symptoms, like his sustained fever, but did not notify a physician, develop a treatment plan, or facilitate his transport to a hospital. *Id.* ¶ 80. Then, for the next two days, Mr. Oakie was monitored by Nurses Younes and Tyson, who continued to watch his condition decline, documented his fever continuing to rage, and did nothing. *Id.* ¶¶ 82-84. Put simply, Mr. Oakie's providers dismissed his legitimate and serious symptoms as a common cold. Per *Ancata*, such deficient care amounts to no care at all, and constitutes deliberate indifference. This is the precise type of deprivation of care that flows from MCJ's widespread practices.

Mr. Oakie's own experience is so linked to MCJ's unconstitutional practices that it corroborates their very existence. Mr. Oakie died because of this sustained pattern of deficient medical care by multiple, independent staff members abiding by the custom of deficient medical care. Indeed, a plaintiff plausibly alleges a "custom" supporting municipal liability where multiple separate medical providers fail to provide medical care in the face of a patently obvious serious medical need. *Howard*, 305 F. Supp. 3d at 1336. MCJ's pattern of depriving detainees of medical care reached Mr. Oakie at booking, where staff assessed him as underweight, but did not take steps to address his low BMI. ECF 25 ¶¶ 33-34. Later, he reported hypoglycemia, did not see a provider for seven days, and by then his BMI had dropped further. *Id.* ¶¶ 35-36. Then, Mr. Oakie's final week was marked by one failure of medical care after another: Nurses Little, Ramos, and Gomez independently assessed Mr. Oakie throughout July 22, found him with a fever and exhibiting concerning symptoms, but did nothing except order further nurse observation; then ARNP Cunningham read Mr. Oakie's labs to reflect a severe, systemic infection along with other concerning symptoms, but did nothing; then, two nurses independently found Mr. Oakie to have a high fever after *four days* of a sustained fever and other concerning symptoms, but did nothing; finally, officers who encountered Mr. Oakie in distress chose aggression towards Mr. Oakie instead of addressing his obvious medical distress. There were many opportunities to deviate from the custom and get Mr. Oakie the care he needed. No staff member in MCJ did, so Mr. Oakie died from a treatable infection, spending his last week on Earth in

agony and distress. The cursory treatment that ultimately killed Mr. Oakie was no accident or anomaly. As Plaintiff has plausibly alleged, it was exactly what the unconstitutional custom called for.

*iv. Sheriff Woods' jurisdiction argument is improper and lacks any basis*

In a footnote, Woods argues jurisdiction. Arguments raised only in a footnote should not be considered. *Contessa v. White Pine INS. Co.*, 2024 WL 4710163, *1 (M.D. Fla. Nov. 7, 2024). Additionally, Defendants provide no factual or legal support for this argument and argue lack of jurisdiction regarding Sheriff Woods in his *individual* capacity. Counsel appears for Woods in his official capacity. They state "that entity is not a party-Defendant" and Woods was not served with process. The claims against Woods in his individual capacity are not against him as an "entity," and Defendants do not explain how he is not a "party-Defendant" when he is named in the Amended Complaint. ECF 25, p. 37. More importantly, Woods *was* served on July 9, 2026. ECF 16. Defendants do not explain how service was deficient.

Alternatively, if the Court finds Woods has not been properly served in his individual capacity, there is good cause to extend the service period. *Lepone-Dempsey v. Carroll Cnty. Comm'rs*, 476 F.3d 1277 (11th Cir. 2007). County Defendants, represented by the same counsel, did not identify this claimed deficiency in service until August 31—a day before the expiration of Rule 4's 90-day period. Plaintiff has been operating with the understanding that Woods was not only served but represented by counsel, as the ECF docket report lists Woods as represented William Breen Armistead and Brandon White in his official and individual capacities.

**D. Defendants are not entitled to dismissal on Plaintiff's state law claims.**

Defendants argue Plaintiff did not engage in pre-suit investigation into the matters giving rise to her state law claims and did not furnish the required notice of intent required by §§ 766.104, .106 Fla. Stat. Plaintiff is not required to file such a notice[3] in this case. Chapter 766 only requires a plaintiff to file a notice "before filing a complaint for medical negligence." §§ 766.104, .106. Accordingly, a claim is subject to pre-suit notice requirements only "if the wrongful act is directly related to the improper application of medical services and the use of professional judgment or skill." *Everman v. Kennedy, White & Riggs Orthopedic Assocs., LLP*, No. 2D2024-2678, 2026 WL 1965938, at *3 (Fla. Dist. Ct. App. July 8, 2026) (citing *Payas v. Adventist Health Sys./Sunbelt, Inc.*, 238 So. 3d 887, 893 (Fla. 2d DCA 2018)) (cleaned up). The proximity of a defendant's administrative decisions to medical care does not transform them into medical judgments. *Id*. Further, a claim of deliberate indifference, even when related to the deprivation of medical care, is distinct from a claim of medical negligence. *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) ("Mere incidents of [medical ] negligence or malpractice do not rise to the level of constitutional violations."); *see also Hunter v. Scott,* No. CIVA 07-0448 WSB, 2007 WL 2381988, at *1 (S.D. Ala. Aug. 16, 2007) ("Nor is a constitutional claim of cruel and unusual punishment tantamount to a state claim of malpractice."); *Taylor v.*

---

[3] Plaintiff did provide notice to the Florida Department of Financial Services (Division of Risk Management), Marion County Sheriff's Office, and Sheriff Woods pursuant to § 768.28. Defendants do not contest this.

*Adams*, 221 F.3d 1254, 1259 (11th Cir. 2000) (the deliberate indifference analysis "requires much more than negligence or malpractice"). Plaintiff does not bring any claim of medical negligence against Sheriff Woods or fault him for exercising poor medical judgment. Plaintiff alleges that Sheriff Woods was deliberately indifferent to the detainees in MCJ such that any medical treatment they received amounted to no care at all. *Ancata,* 769 F.2d at 704. Plaintiff's allegations against the Sheriff do not concern a standard of care violation by a medical practitioner; they allege a custom of cruel and unusual punishment towards detainees experiencing medical distress.

Woods also argues sovereign immunity. Although Florida law "evinces the intent of our legislature to waive sovereign immunity on a broad basis," the Supreme Court of Florida has found that "certain 'discretionary' governmental functions remain immune from tort liability." *Com. Carrier Corp. v. Indian River Cnty.*, 371 So. 2d 1010, 1022 (Fla. 1979). It further adopted an analysis for categorizing these government functions: "planning" functions are immune, whereas "operational" functions are not. *Id*. Planning level functions are generally interpreted to be those requiring basic policy decisions, while operational level functions are those that implement policy. *Id.* at 1021. Plaintiff alleges that Sheriff Woods "failed to take reasonable measures to ensure adequate medical care at MCJ or to protect inmates from the substantial risk of harm posed by the constitutionally inadequate medical care provided at the facility." ECF 25 ¶ 200. This falls within the "operational" functions category. In *La Bruno v. Miami-Dade Cnty.*, the plaintiff alleged state law negligence related to the medical care, or lack thereof, that he received at a county

jail. No. 10-22554-CIV, 2011 WL 1103783, at *10 (S.D. Fla. Mar. 23, 2011). The plaintiff alleged that "he was not getting the medical care he needed because of institutional failings despite mechanisms for treatment that were in place." *Id*. The court found this to be an operational function and declined to apply sovereign immunity. *Id*. Similarly, Plaintiff alleges that there were mechanisms for treatment in place at the jail. There was an infirmary, a contract with a private medical provider, nurses, and a nurse practitioner, all of which facilitated the capability of providing Mr. Oakie with care. The problem is that Sheriff Woods had implemented the jail's medical care policies in such a way that practitioners routinely provided cursory care to save money. That is an operational decision not subject to immunity.

## CONCLUSION

While in MCJ, Mr. Oakie's obvious signs of medical distress were ignored by Deputies Custodio, Iovino, and Gordon, even after Custodio's actions of spraying pepper gel increased his distress. These actions not only constituted deliberate indifference, but were consistent with a custom within MCJ of depriving detainees of healthcare. The motion to dismiss (ECF 30) should be denied in its entirety. Alternatively, if the Court identifies deficiencies in Plaintiff's pleading, Plaintiff should be granted leave to amend and cure such deficiencies.

WHEREFORE, Plaintiff respectfully requests this Honorable Court deny Defendants Sheriff Woods, Captain Spivey, Custodio, Iovino, and Gordon's motion to dismiss Plaintiff's Amended Complaint.

Respectfully submitted,

*/s/ Sam Harton*

**ROMANUCCI & BLANDIN**
Sam Harton*
321 N. Clark St. STE 900
Chicago, IL 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
sharton@rblaw.net
*Pro hac vice

James M. Slater (FBN 111779)
SLATER LEGAL, PLLC
2296 Henderson Mill Rd NE #116
Atlanta, Georgia 30345
Tel. (404) 458-7283
james@slater.legal

*Attorneys for Plaintiff*

**Local Rule 3.01 Certification**

This brief is less than 30 full pages, exclusive of the case style, signature block and certificates. Plaintiff filed a motion for leave to file an oversized brief on September 25, 2026. ECF 36. The additional pages are necessary to respond adequately to the arguments raised in Defendants' motion.

By: */s/ Sam Harton*

Sam Harton